**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. _____**

Dominik Karnas, *et al*., on behalf of themselves
and all others similarly situated,

       *Plaintiffs,*

v.

McCarter & English, LLP, and The National
Basketball Association, Inc.

       *Defendants.*
_____/

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.      After more than a year of extensive discovery in the related Voyager action, *Karnas v. Cuban*, Case No. 22-CV-22538-ALTMAN/Reid (S.D. Fla.) ("*Karnas*"), including third-party discovery directly from these new Defendants, it is now apparent the National Basketball Association ("NBA") and the national law firm of McCarter & English, bear responsibility to the proposed class for the $4.2 billion dollars in damages resulting from the implosion of Voyager's crypto exchange.



2.      Though the relevant facts here seem complicated, this case is very simple. Voyager has completed the bankruptcy process, and has documented $4.2 billion dollar losses to the class. Various Defendants that directly promoted Voyager have been in litigation in *Karnas*, including Voyager's Global Partner the Dallas Mavericks, Mark Cuban, and celebrity promoters Rob Gronkowski and Victor Oladipo. Mr. Cuban recently completed the sale of his ownership interest

in the Dallas Mavericks.[1] Claims have already been filed, or will be filed, against all those who promoted this fraudulent crypto exchange and solicited, or substantially participated in, the sale of its unregistered crypto offerings.[2]

3.      The three main sports organizations in the United States are: (1) the NBA, (2) Major League Baseball ("MLB"), and (3) the National Football League ("NFL").[3] According to their leaders, the COVID-19 pandemic was to be the "life or death" for all 3 organizations, as all

---

[1] Of course, only Mr. Cuban and the parties to the sale know if his decision to sell had anything to do with the large possible liability Cuban faces in *Karnas*. To be sure, practically all of Cuban's other crypto ventures have failed. The price of Iron Titanium, a token Mr. Cuban disclosed he owned, went from a high above $64, to less than 0.01% of a penny, after some of its biggest investors started selling the token at high volumes. According to Cuban's tweet about Iron Titanium's crash, "I got hit like everyone else. Crazy part is I got out… [Then] Bam."

According to the *New York Times*: "more than two weeks later, the basic question surrounding the sale — Why did Mr. Cuban do it? — remains mostly unanswered. The reliably loquacious Mr. Cuban, who always seemed to be having more fun than any other owner, declined to speak on the record for this article." According to the *New York Post*: "The Mavericks' sale was particularly stunning given how much of Cuban's identity has been tied up in ownership of the franchise since he purchased it in 2000." There can be no debate that Cuban loves his Dallas Mavericks and he has done a wonderful job building up the franchise and team. According to promotional materials, he has owned the Mavericks for 12 seasons, and "in that time he has quickly made himself the most personable and, quite simply, the best owner in sports. Whether he's jumping up and down courtside protesting a bad call or making savvy moves in the front office, Cuban is the most well-rounded proprietor in sports. He is absolutely adored in the Dallas area and, more importantly, his players love him too".

"Nothing's really changed except my bank account," Mark Cuban said to reporters after the NBA approved his sale, but before any details of the sale were revealed. Mr. Cuban stated that he "will still maintain control of basketball operations." After the sale was approved by the NBA, however, it was confirmed that Mr. Patrick Dumont was taking over as the official Mavericks' Governor. Mr. Cuban explained one reason was the expertise of Mr. Dumont and his family in real estate, which certainly cannot be disputed. Mr. Dumont, who is 45 years old, has risen to the top levels at the Las Vegas Sands and his company owns and runs famous hotels like The Venetian Macao Resort Hotel, the Londoner Macao, and Marina Bay Sands in Singapore. He is the Chief Financial Officer, Executive Vice President, and a director and according to many articles, he "does many different things in the business world". Mr. Cuban concluded that he wanted to grow the Dallas Mavericks "by bringing in partners skilled in real estate."

[2] In similar litigation, all those that promoted and advertised Opioids, for example, have been sued and held liable for their involvement in promoting and advertising those lethal drugs.

[3] Teams and celebrities in Formula One and Soccer have already been named Defendants in various class actions.

arenas and stadiums were forced to close and broadcasters were shutting down their productions. Each sports organization was thus required to raise hundreds of millions of dollars in new forms of revenue, and each knew that these decisions, and these new forms of revenue (including specifically crypto currency) had very serious consequences.

4.     While all three organizations had similar written Guidelines regarding cryptocurrency, they each decided to take a different road. Unlike the NFL, MLB and NBA decided to "go all in" with billions of dollars in new crypto advertisers and marketing, and thus MLB has already been named as a Defendant in the FTX MDL pending before this Court.

5.     There is no dispute that the NBA was to serve as the "gatekeeper", and required to affirmatively approve any and all NBA promotion and marketing campaigns, especially with crypto currency. Evidence now reveals that the NBA was not only grossly negligent with its review of the proposed Voyager/Mavericks Global Partnership, but the NBA's decision to affirmatively approve FTX sponsoring the Miami Heat Arena, here in Miami, Florida was one of the most important steps, in the dramatic rise of cryptocurrency across the country, and across the globe.

6.     FTX insiders that were personally involved with making the application and presentation to the City of Miami, state they were "surprised" how quickly the NBA provided their affirmative approval required for the FTX Arena.

7.     Importantly, Plaintiffs, through undersigned counsel, have diligently sought during the past six months, to investigate and resolve any and all claims against McCarter & English, yet these efforts have been unsuccessful. Initially, Plaintiffs engaged directly with Joseph Lubertazzi Jr., Managing Partner at McCarter & English, for information relating to the *Karnas* action. Several months later, McCarter & English engaged outside counsel to resist.[4] After Plaintiffs were finally allowed to depose McCarter & English's corporate representative, and only after extensive communication, including hundreds of hours spent in Zoom meetings, emails, and telephone

---

[4] The current outside counsel for McCarter & English possesses extensive experience in cases involving attorneys who produced fraudulent legal opinions and participated in a RICO conspiracy. Notably, in his former capacity as the United States Attorney for the Southern District of Florida, outside counsel was instrumental in prosecuting lawyers who created deceptive legal opinions for convicted Ponzi schemer Scott Rothstein. Crucial to Rothstein's scheme was his procuring Legal Opinions that falsely attested to the legality of his investment schemes and claimed thorough due diligence had been conducted. https://www.justice.gov/usao-sdfl/pr/fort-lauderdale-attorney-sentenced-connection-scott-rothsteins-ponzi-scheme

conversations, did Plaintiffs uncover the information about McCarter & English's role in the Voyager fraudulent scheme that compelled them to file this action.

8.      McCarter & English's participation in Voyager's RICO enterprise is crucial, particularly as several other Voyager Defendants have already asserted, and/or will assert, a "reliance on counsel" defense. Currently, Magistrate Judge Reid is conducting an *in-camera* review to determine whether the Dallas Mavericks and Mark Cuban in the pending *Karnas* litigation should be compelled to produce documents they are withholding under the "reliance on counsel" defense.

9.      Plaintiffs have repeatedly requested McCarter & English submit specific documents to the Court also for *in-camera* review. These documents, which seem to be exact copies of questionnaires from potential Voyager investors (based on deposition testimony), could demonstrate McCarter & English's awareness that investors were relying on their dubious legal opinions. Despite these requests, McCarter & English has declined to provide these documents, identified as "Attachment attached to email from client to counsel seeking legal advice re: comments to questionnaire to submit to potential investor," and labeled MCCARTER 416 through 426, and 339 and 349.[5]

10.     One crucial issue that McCarter & English exploited in their furtherance of the Voyager conspiracy was whether the Voyager token ("VGX"), and the Voyager Earn Program Accounts ("EPAs") (the only account Voyager offered and therefore what every Voyager customer necessarily purchased when signing up for Voyager), were (or were not) unregistered securities. As explained more fully in this complaint, McCarter & English lent their credibility as an established law firm to Voyager in issuing a bogus "Legal Opinion" that concluded Voyager's VGX token was "not an unregistered security" and was further enlisted to assuage the concerns of potential investors and partners in Voyager Digital that its offerings like VGX and EPAs were not securities at all, but were instead entirely above board. The Legal Opinion was based upon absurd

---

[5] Mirroring the actions of other Defendants (like McCarter & English and the Dallas Mavericks), the **NBA has withheld a few documents**, citing "reliance on counsel" as basis for nondisclosure. These documents would be produced if the NBA opts to assert a "reliance on counsel" defense in this case.

facts that McCarter & English knew, or should have known, were false and illogical and served as the lynchpin for other co-conspirators to bypass the existing safety procedures.

11.     McCarter & English knew, and/or should have known, that its opinions were false and were being transmitted through the wires to facilitate the Voyager RICO enterprise nationwide. And since then, much has occurred that shine a spotlight on just how effective and dangerous McCarter & English's conduct was.

12.     *First*, just last month, almost *two years* since undersigned counsel first brought suit against Voyager and its Chairman Steve Ehrlich, the Federal Trade Commission announced a settlement with bankrupt crypto company Voyager that permanently bans it from handling consumers' assets and sued the former CEO, Stephen Ehrlich, for falsely claiming that customers' accounts were insured by the Federal Deposit Insurance Corporation (FDIC) and were "safe," even as the company was approaching an eventual bankruptcy.

13.     The FTC charged that from at least 2018 until it declared bankruptcy in July 2022, Voyager promised that consumers' deposits would be "safe" to entice customers to hand over their funds. When the company failed, consumers lost access to significant assets they had saved, including ongoing salary deposits, college tuition funds, and down payments for homes, according to the complaint, which notes that consumers were locked out of their cash accounts for more than a month and lost billions in crypto assets.

14.     "Consumers reported over $1.4 billion in losses to cryptocurrency scams in the last year, and the FTC continues to crack down on those who lie to consumers about these risky assets," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "This action reminds companies and individuals: don't play fast and loose with claims about FDIC insurance." Voyager agreed to a judgment of $1.65 billion, but the case against Mr. Ehrlich will proceed in federal court.

15.     *Second*, the main reason Voyager was forced to declare for bankruptcy protection was that the New Jersey State Securities Authority (where Voyager was based) issued a "Cease and Desist" letter prohibiting the sale of the unregistered VGX tokens and Voyager Interest Accounts. New Jersey was joined by a Working Group of eleven other state attorney generals in these fraudulent actions.

16.     *Third,* the Securities and Exchange Commission has always concluded and publicly stated that the VGX token, and Voyager Interest Accounts were all, the illegal sale of

unregistered securities. [6] FTX was the first crypto company that initially (now it appears fraudulently) offered to buy Voyager's assets with stolen client funds. When that apparently fraudulent sale fell apart, the SEC formally objected in the federal Bankruptcy Court when Binance reportedly made an offer for bankrupt Voyager arguing that sale would simply be the sale "of unregistered securities." The only result of these two unsuccessful purchases of Voyager in the Bankruptcy Court was: (1) to burden the Voyager victims with hundreds in millions of costs and fees paid to the Voyager/FTX/Binance professionals, and (2) to delay any relief for the millions of Voyager victims by two years.

17.     Crucially, since Undersigned Counsel first filed crypto securities class actions in this District, the binding law in this Circuit, and elsewhere across the country, regarding mass promotion of crypto currency and unregistered securities was recently clarified (and updated for today's technology) so now a promoter, like the NBA, with a financial incentive for itself or for the financial benefit of the securities issuer, like Voyager, can be held liable under securities laws for using the internet and social media for mass solicitations of cryptocurrency. Investors can thus now state a cause of action against promoters like the NBA, who had a financial incentive in the crypto products and exchange, for making mass solicitations for cryptocurrency sales over the internet.

18.     In *Wildes v. BitConnect Int'l PLC,* 25 F.4th 1341 (11th Cir. 2022), the Eleventh Circuit clearly articulated the standard applicable to mass solicitation of unregistered securities, ruling that spokespersons who promoted a crypto Ponzi scheme had engaged in "solicitation" of securities by "urg[ing] people to buy [crypto tokens] in online videos," even if the offering's promoters did not directly target particular purchasers. *Id.* at 1346. In so ruling, the Court observed that the Securities Act does not distinguish between individually targeted sales efforts and broadly disseminated pitches, and noted that in early cases applying the Securities Act of 1933, "people understood solicitation to include communications made through diffuse, publicly available means – at the time, newspaper and radio advertisements." *Id.*

---

[6] *See, e.g., SEC v. Coinbase, Inc., et al.*, No. 1:23-cv-04738, ECF No. 1 (S.D.N.Y. June 6, 2023), accessible at www.sec.gov/files/litigation/complaints/2023/comp-pr2023-102.pdf (SEC enforcement action against Coinbase, defining VGX as one of the "Crypto Asset Securities," at ¶ 114, and conducting full *Howey* analysis at ¶¶270–82.") (acc. January 24, 2024).

19.     *In Pino v. Cardone Capital, LLC,* 55 F.4th 1253 (9th Cir. 2022), the Ninth Circuit adopted *Wildes* in its entirety, holding that a real estate management company that promoted real estate investment funds through "mass communications to potential sellers" via nontargeted internet videos posted on social media could be a statutory seller liable for solicitation based on YouTube videos and Instagram posts touting the investments and rates of return. *Id.* at 1259–60. The court noted that, to state a cause of action, a plaintiff "need not have alleged that he specifically relied on any of the alleged misstatements identified in the [complaint]." *Id.*

20.     *In De Ford v. Koutoulas,* 6:22-CV-652, 2023 WL 2709816 (M.D. Fla. Mar. 30, 2023), the court denied a motion to dismiss claims that a spokesperson for "Let's Go Brandon" cryptocurrency (LGBCoin) engaged in the solicitation of unregistered securities. Citing *Wildes,* the court rejected the argument that "mere social media posts cannot make him a seller of securities" and held that the plaintiff had sufficiently alleged a claim for selling unregistered securities by alleging (1) the online promotion of LGBCoin through social media channels, and (2) that the promotions were done to serve the spokesperson's own financial interests. *Id.* at *15.

21.     Most recently, on September 20, 2023, Judge William H. Orrick of the Northern District of California, applying both *Pino* and *Wildes,* denied a motion to dismiss by a promoter who was sued for participating in a scheme similar to FTX's to sell unregistered securities in the form of cryptocurrency, concluding that the suit alleged that the defendants actively solicited sales of the crypto assets, and were not just "mere collateral participants." *Houghton v. Leshner*, No. 3:22-cv-07781, 2023 WL 6826814, at *3–5 (N.D. Cal. Sept. 20, 2023). In reaching that conclusion, Judge Orrick reasoned that "[s]olicitation is broadly construed," and a promoter "could be a statutory seller liable for solicitation based on YouTube videos and Instagram posts touting the investments and rates of return." *Id.*, (emphasis added) (citing *Pino*, 55 F.4th at 1256; and then citing *Wildes*, 25 F.4th 1341).

22.     As the COVID-19 pandemic crippled the sports and entertainment sectors, potentially altering them irrevocably, the NBA faced a pivotal choice crucial to its future viability. The options were stark: (1) emulate the NFL's cautious approach by steering clear of the volatile and unknown world of cryptocurrency, or (2) go "all in," aggressively endorsing crypto and aligning the prestigious and popular NBA brand with Voyager, a move aimed at catapulting the NBA to the forefront of the cryptocurrency arena. This decision, fraught with risk, involved

promoting and selling billions of dollars in unregistered and illegal securities to the public, by leveraging the global reputation and trust in the NBA brand.

23.     Evidence has already been uncovered illustrating the dire condition of many sports organizations and entertainment businesses due directly to the global COVID-19 pandemic. Between those dynamics and the rise of the industry, lucrative promotion deals with cryptocurrency-related organizations increased 4000%. Despite market pressures, some organizations, such as the NFL, performed due diligence and decided not to take the risks of partnering with cryptocurrency industry players. Crypto customers have now lost more than $11 billion dollars and some exchanges such as FTX and Voyager have gone bankrupt, so this complaint is one of the victims' only avenues to recoup any of those direct losses from these specific promoters.

24.     The NBA carefully and deliberately decided to embrace the risks associated with cryptocurrency exchanges such as Voyager, FTX, and Coinbase, and go all in. This decision, however, led to significant legal and financial repercussions—not only is there binding precedent that the NBA's widespread promotion of Voyager's unregistered securities renders it liable for any and all resulting damages, but as the Voyager bankruptcy and civil charges against Voyager and its co-founder Stephen Ehrlich demonstrate, losses to the victims now exceed $4 billion. This lawsuit simply seeks to hold the NBA liable under the applicable law.

25.     The easiest manner to understand and adjudicate the specific actions of the NBA is to compare what actions were taken by the NBA, the NFL, and MLB. All major sports enterprises were faced with the global COVID-19 epidemic, but each decided to take a different path and thus each must now be judged accordingly. As will be described in great detail below, while the NBA and MLB both gave serious contemplation to the issue and decided to go "all in with crypto currency" (joining most other celebrities and global entities) when they saw the potential for fast money, the NFL decided it was best to wait and continue to research the law before jumping in. In fact, the NFL had the foresight to specifically *bar* its teams from selling sponsorships to cryptocurrency trading firms back in September 2021, because it needed the chance to evaluate

the cryptocurrency industry more closely before it could develop and implement its official strategy.[7]

26.     The NBA had written and official Crypto Currency Protocols in place specifically to serve as "safety checks" and gatekeepers, to ensure that a cryptocurrency fraud of this massive global size and scale could not occur. The NBA violated their own written Crypto Currency Protocols, all solely for its own financial gain.

27.     According to the Commissioner of the NBA, COVID-19 was to be the "life or death situation" and although the NBA had specific Crypto Currency Safety Guidelines to prevent the promotion of unregistered securities, the NBA made a very conscious and deliberate decision to accept billions in promotional compensation, when faced with the once-in-a-generation risks of COVID-19, in order to deal with empty arenas and the loss of billions in television revenues. The MLB proceeded similarly and has already been named as a Defendant in the FTX MDL pending before this Court.

28.     McCarter & English's story is certainly less dramatic. Voyager Digital, and all crypto platforms at that time, were in fierce competition with each other to collect billions in customer assets, but more importantly, battling and competing with the state and federal regulations that were all holding that these specific crypto tokens and interest accounts were in fact, the sale of unregistered securities. According to those directly running these crypto platforms at this time, it was becoming increasingly difficult to find reputable law firms to generate necessary "Legal Opinions," specifically stating that the crypto token or crypto interest accounts were not securities.

29.     As regulatory enforcement actions, opinions, and guidance were being issued against the crypto platforms and the products they offered for sale more frequently (including, ultimately, Voyager), the list of law firms willing to commit to drafting Crypto Legal Opinions were dwindling.

30.     By the time Mr. Ehrlich convinced a young, inexperienced partner at McCarter & English (other Partners within the Firm have played a major role on behalf of ***crypto plaintiffs*** in many other crypto class actions) to draft the subject Voyager Legal Opinion, not only did the

---

[7]     https://finance.yahoo.com/news/why-nfl-bans-cryptocurrency-nft-164438729.html (accessed November 19, 2023).

overwhelming existing state and federal regulatory authority provide that these products were unregistered securities, but much worse, in order to issue the "Legal Opinion" to begin with, McCarter & English had to accept basic "facts" from Mr. Ehrlich that defied logic. For example, Mr. Erlich stated that there would <u>be no secondary market</u> for Voyager's VGX tokens and <u>they would not be sold for a profit</u> (which a simple investigation by McCarter & English would have quickly disproven ). McCarter & English, however, was happy to take Voyager's money, turn a blind eye to reality, and allow Voyager to hawk its "Legal Opinion" to solicit investors in its platform and to enlist promoters like the Dallas Mavericks and Mark Cuban, to solicit their sales to retail investors across the country. In so doing, McCarter & English was so reckless and grossly negligent in their work that they crossed the line into soliciting the sale of unregistered securities and in actively participating in and enabling this RICO Conspiracy that has caused documents billions in damages.

## JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, in which at least one class member is a citizen of a state different than Defendants.

32.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants, pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6), because Defendants conduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, engaging in a civil conspiracy with residents of the state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants were engaged in solicitation or service activities within this state, or products that Defendants promoted, sold, and offered for sale in this state were used or consumed within this state in the ordinary course of commerce, trade, or use.

33.    Additionally, Defendants have intentionally availed themselves of the Florida consumer market through the targeted promotion, marketing, and sale of Voyager's EPAs and VGX in Florida, which constitutes committing a tortious act within the state of Florida. Defendants

have also marketed, participated and/or assisted in the sale of Voyager's unregistered securities to consumers in Florida, in violation of section 517.07 *et seq*. Defendants have also violated Florida's consumer protection statute, section 501.201 *et seq*. Personal jurisdiction over Defendants is established under Rule 4(k)(1) of the Federal Rules of Civil Procedure based on service of summons upon or waiver of service by Defendants, each of which is subject to the jurisdiction of courts of general jurisdiction in Florida. This Court's exercise of jurisdiction over Defendants for the claims asserted in this action comports with traditional notions of fair play and substantial justice.

34.     Venue is proper in this Court under 28 U.S.C. § 1391 because thousands of Class Members reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; Defendants have caused harm to Class members residing in this District; Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District; and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District.

35.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

**PARTIES**

I.     **PLAINTIFFS**

**Edwin Garrison**

36.     Edwin Garrison is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Garrison purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

37.     On October 29, 2021, Mr. Garrison originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. He further repurchased, reinvested, deposited, and/or

12

transferred additional funds into his throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

38.     Mr. Garrison was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform.

**Dominik Karnas**

39.     Dominik Karnas is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Karnas purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

40.     While in Florida, on or about November 14, 2021, Mr. Karnas purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Karnas further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

41.     Mr. Karnas was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform.

**Rahil Sayed**

42.     Rahil Sayed is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Sayed purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

43.     On February 3, 2021, Mr. Sayed originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Sayed further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned

interest on certain holdings, until Voyager collapsed. Mr. Sayed was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform.

**William Ayer**

44.     Plaintiff William Ayer is a citizen and resident of the Commonwealth of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Ayer purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

45.     On February 1, 2021, Mr. Ayer originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Ayer further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

46.     Mr. Ayer was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform.

**Anthony Dorn**

47.     Plaintiff Anthony Dorn is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Dorn purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

48.     On February 12, 2021, Mr. Dorn originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Dorn further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

49.     Mr. Dorn was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform.

**Todd Webb**

50.     Plaintiff Todd Webb is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Webb purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

51.     On October 30, 2021, Mr. Webb originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Webb further repurchased, reinvested, deposited, and/or transferred additional crypto into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

52.     Mr. Webb was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, while in Florida, Mr. Webb conducted research on cryptocurrency.

## II.     THE TWO NEW VOYAGER DEFENDANTS

53.     Defendant McCarter & English, LLP is a limited liability partnership organized under the law of the State of New Jersey with its principal place of business in Newark, New Jersey. McCarter & English is a national U.S. law firm with offices throughout the country.

54.     Defendant National Basketball Association, Inc. is incorporated in the State of New York with its principal place of business in New York. The NBA's operations and activities span the United States, including a significant presence in the State of Florida, where regular season games occur for two of its teams—the Miami Heat and Orlando Magic—drawing substantial fan engagement and commercial activity within the state. The NBA also operates, conducts and engages in business in Florida including through contractual relationships with various businesses within the state, promotional efforts and broadcasts directed into the state, relations with two of its members and numerous players which are based in the state, and other events and business activities in the state of Florida. The NBA has also intentionally availed itself of the Florida

15

consumer market through the promotion, marketing, and sale of unregistered securities to consumers in Florida, including to those similarly situated to Plaintiff, which constitutes committing a tortious act within the state of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over the NBA permissible under traditional notions of fair play and substantial justice.

## FACTUAL ALLEGATIONS

### A. The Voyager Scheme.

55.     It is now clear beyond reasonable dispute that Voyager was a massive fraud that ended in bankruptcy and victimized more than a million victims, costing innocent investors billions of dollars. FTX was the first potential buyer/savior, but FTX since collapsed under the weight of its own fraud. Binance followed but has since been hit with a $4.3 billion fine by the Department of Justice. The reason is now clear: all of these platforms (Voyager, FTX and Binance) involve the sale of billions of dollars of the same unregistered securities, all in the form of native tokens and interest accounts. The SEC has made it clear that they will not allow these illegal practices to continue.

56.     To make the Voyager scheme work, Voyager's founder and CEO, Stephen Ehrlich, contracted with world-famous celebrities and athletes to enlist them as Voyager's agents to solicit and promote Voyager's unregistered securities, in order to successfully raise billions of dollars and reach as many as 300 million investors across the country. Voyager could not have succeeded without the support and credibility these promoters provided.

57.     Voyager likewise could not have executed its scheme without the participation of sports organizations and entertainment businesses, which took actions to aid and abet Voyager in its fraud and unlawful activity. Ehrlich placed a high value on supporting Voyager's public image through partnerships with various globally recognized sports organizations, teams, and players, which is why Voyager contracted with and enlisted them to solicit and promote Voyager's unregistered securities. Ehrlich sought out such partnerships to help Voyager achieve its goal of reaching as many as 300 million investors across the country, driving all U.S. investors to purchase EPAs, and raising billions of dollars.

58.     One of the most important of these Voyager promotional partners was the NBA's Dallas Mavericks. Voyager could not have succeeded without the support and credibility the NBA

16

and the Mavericks provided. Unfortunately for Plaintiffs and the Class, those promotions were wildly successful.

59.     Voyager operated a cryptocurrency investing application for iOS and Android mobile devices (hereinafter, the "Voyager Platform") that allowed users to purchase and trade cryptocurrency and invest money in interest bearing accounts. Until Voyager's recent bankruptcy, it claimed to have more than $5 billion in assets under management and over 3.5 million investors.

60.     At all times relevant to this lawsuit, Voyager's stock was listed and publicly traded on Canadian stock exchanges and sold throughout the United States, including in Florida, through many US brokerages in "over-the-counter" trading.

61.     Voyager quickly became one of the most utilized avenues for investors to purchase and invest in cryptocurrency and related crypto securities, based upon false representations and other deceptive conduct further detailed herein. Voyager's scheme was specifically designed to take advantage of unsophisticated investors who utilize mobile apps to make their investments.

62.     It engaged in an extremely aggressive promotional and solicitation campaign via influencers and celebrities who received financial incentives, that targeted primarily new or less knowledgeable cryptocurrency users. Users could download the application, create an account, fund it (by transferring US dollars ("USD") from a bank or cryptocurrency from a "wallet"[8]), and begin trading immediately. Voyager claimed that users could open an account and begin trading in three minutes or less.

63.     Voyager positioned itself to connect users with more than a dozen different cryptocurrency exchanges and to trade more than 50 cryptocurrencies. Voyager did that so its users could build a portfolio of crypto assets without having to sign up for multiple exchanges and manage multiple accounts.

64.     To execute transactions and obtain for its users the best execution prices for crypto trades, Voyager claimed to employ various proprietary technologies including the so-called "Voyager Smart Order Router." According to Voyager, when users made a purchase or a trade,

---

[8] Cryptocurrency is sent and received from or to so-called "wallets," which are locations identified by a combination of letters and numbers called a "hash" that is unique to the holder of the "key" for that wallet address. Wallets are roughly analogous to an email address or bank account number that allows for the transmission of cryptocurrency from one user to another.

they could select the currencies they intended to buy or sell (and the amount), but users would not choose which exchange the currency came from. Rather, Voyager represented to users that it would execute the transaction at the best price available across multiple exchanges.

   **B.   Background of the Voyager Tokens and Interest Accounts**

65.    On October 23, 2019, Voyager began offering through its mobile phone cryptocurrency trading application, interest-bearing cryptocurrency accounts to public investors, offering high rates of return, represented as low-risk, in an otherwise near zero-interest rate environment. Voyager has referred to these accounts by various names over time, including the "Voyager Interest Program" or the "Voyager Earn Program Accounts" (hereafter referred to as "Earned Programs Accounts" or "EPAs"). But regardless of the name, every account Voyager sold during the class period was necessarily an EPA.

66.    Plaintiffs and other similarly situated individuals all invested in Voyager's EPAs. These EPAs are clearly securities under applicable law.[9] There is no dispute that Voyager never registered the EPAs with the United States Securities and Exchange Commission ("SEC") or with any state securities regulators.

67.    Voyager spent tens of millions of dollars to market these EPAs to every consumer in the country, without following any of the regulatory requirements required of issuers offering and selling securities designed to protect investors.

68.    Instead, with the help of unscrupulous agents such as Defendants, they targeted investors in Florida and across the country, many with admittedly very limited experience with cryptocurrency.

69.    There can now be no dispute: the NBA was a vital member of Voyager's fraudulent scheme to push billions of dollars of its unregistered securities on the American public. Mr. Ehrlich, as Voyager's CEO, needed the NBA (and specifically the NBA's own team, the Dallas Mavericks, and its owner Mark Cuban) to provide him the necessary gravitas and credibility to peddle EPAs to the public, particularly in the face of all the state and federal regulatory activities.

---

[9] The question of whether Voyager's offering and selling the EPAs violates applicable securities laws is a common and predominant issue that is capable of swift resolution by this Court on a class-wide basis, which determination would materially advance this litigation for Plaintiffs and the potentially millions of affected consumers around the nation.

The NBA in turn needed Mr. Ehrlich to supplement the hundreds of millions of dollars it had lost as a result of the COVID-19 pandemic and the lack of in-person attendance at NBA games across the country.

70.     As far back as 2017, the SEC began issuing opinions regarding the promotion of similar unregistered offerings for many of the largest crypto platforms, including Coinbase, FTX, Voyager, and BlockFi. After enforcement proceedings were brought by the SEC and state regulators in mid-2021, BlockFi — represented by the law firm Sullivan & Cromwell (who also represented FTX) — agreed to settle similar "unregistered securities" charges with the SEC and numerous state attorneys general, paying an over $100-million-dollar fine and agreeing to injunctive changes regarding their practices surrounding the offer and sale of interest-bearing cryptocurrency accounts. Also in mid-2021, Coinbase received a Wells notice from the SEC over their plans to launch an interest-earning product, which subsequently led them to drop the product.

71.     It is important to note that many crypto platforms for the past few years have sought to obtain their own confidential legal opinions to share with investors to convince them that their interest-bearing accounts, native cryptocurrency tokens, and other offerings were not securities required to be registered with any securities regulators. This became more difficult, however, as the SEC brought dozens of enforcement actions and made public their findings that the majority of these offerings are, in fact, securities, dealing a significant blow to any "fair notice" defenses or ability for law firms to plausibly state in good faith that these offerings were not securities.

72.     Each of the Plaintiffs and the proposed Class Members, purchased, repurchased, invested, reinvested, deposited, and/or transferred additional crypto into an EPA offered for sale from Voyager's base of operations in New Jersey after being exposed to the deceptive, unlawful, and NBA-approved promotions of the Voyager Platform as detailed in this complaint, and they each sustained damages as a result. As discussed below, New Jersey specifically intended its own state securities laws to apply extraterritorially for the benefit of every purchaser nationwide because the actions of Voyager took place from its principal place of business in New Jersey. The EPAs that Voyager sold to Plaintiffs were no different (in any manner) than any of the other EPAs that Voyager offered and sold to all investors throughout the nation during the class period, all of which are currently subject to investigation by federal and state regulatory authorities as being

unregistered securities, and which number in "at least tens of thousands" in the state of Florida alone.[10]

### C. Voyager Misrepresented Its Products and Deceived the Public.

73.     According to its creators, "The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace."[11] Voyager represented prominently and consistently to the investing public that the Voyager Platform offered trades that were "100% Commission-Free."

74.     Voyager also claimed to provide users that bought and sold cryptocurrencies the ability to execute trades across a spectrum of exchanges in order to give Voyager "deep pools of liquidity."[12] It also offered a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.[13] Some of the additional features that

---

[10] *See* Excerpts of Transcript of Voyager Digital LLC's corporate representative in *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), at ECF No. 34-1, at 89 (41:20–42:15) ("Q. [I]f Mr. Cassidy was in Texas or if he was in California, would there be any differen[ce] that you would look at in this chart in terms of how he was paid interest every month if both people met the minimum amount that was necessary each month? . . . THE WITNESS: No. His earn would be the same, as far as I know, in those state -- in those states. Q. So there's no distinction for the Voyager Earn Program by state. . . . THE WITNESS: Yes, as far as I'm aware."); *see also id.* (107:10–13) ("Q. There's definitely at least tens of thousands of Voyager Platform members that are residents of the State of Florida? A. Oh. Yes."); *id.* (133:2–134:13) ("Q. Okay. So . . . my next question is, all of these investigations that are being done by the State AGs and the SEC applies to Mark Cassidy Program account? . . . THE WITNESS: I'm not sure. I – I would – I think, yes. . . . Q. What else do you need from us so that you can say, as the corporate rep depo -- deponent who is the most qualified to talk about Mark Cassidy's account, that his account is the same account that these attorney generals and the SEC are saying possibly should be registered securities? . . . THE WITNESS: To the extent I know, they – they would not be different from any of the other accounts.").

[11] The operative complaint in *Cassidy* is found at ECF No. 46. *See* "Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading," dated May 5, 2021 (attached to the *Cassidy* Complaint as Exhibit J).

[12] *See Cassidy* Complaint, Ex. H.

[13] *Id.*

Voyager offered were: (a) users could trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies; (b) Voyager allegedly minimized transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing the "Smart Router" technology; and (c) Voyager claimed to store crypto assets in a secure wallet and in a "cold" facility, with 24/7 security.[14]

75.     These representations enabled Voyager to obtain an edge over its competitors, including but not limited to Coinbase, Gemini, Kraken, and Binance, who openly display the applicable fees and commissions they charge on each trade.

76.     Voyager's representation that trades on the Voyager Platform were "100% Commission-Free," however, were false and intended to mislead reasonable consumers. In fact, Voyager secretly charged exorbitant commissions on each trade.

77.     Voyager perpetrated the scheme by, among other means, maintaining the "spread" (i.e., the difference between the "Bid Price" and "Ask Price" on a given cryptocurrency) intentionally wide on all cryptocurrencies listed throughout the Voyager Platform. Voyager explained in its most recent Management's Discussion and Analysis that the spread was a main source of revenue:[15]

> Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

78.     Although the Voyager Platform displayed a "Fair Market Price" for each cryptocurrency, which fell somewhere in the middle of the spread, Voyager automatically executed market orders at the highest end of the spread, from which they pocketed secret commissions.

---

[14] *Id.*

[15] *See* Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Nine Months Ended March 31, 2021, dated May 25, 2021, (Ex. M of the *Cassidy* Complaint).

79.     Moreover, once a user submitted a market buy order, the "Estimated Price" for the trade displayed on the Voyager Platform automatically defaulted to an amount higher than the quoted "Ask Price" at the top end of the spread, so that an order could be executed at an amount "less" than the "Estimated Price," but still at the very top end of the spread. Similarly, for market sell orders, the trade automatically defaulted to an amount lower than the quoted "Bid Price" at the bottom end of the spread so that the order could be executed at an amount "more" than the "Estimated Price," but still at the bottom end of the spread.

80.     To effectuate and conceal this deception, Voyager claimed to use proprietary systems, which they referred to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm." [16]

81.     In describing the Smart Order Router, Voyager maintained that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills them in the market for the customer using its proprietary order routing algorithm."[17] The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across our liquidity sources and streams this price to its users."[18]

82.     Voyager also utilized vague and opaque representations to tout that it would only "share" in "price improvement" where it could fill a user's order at a price better than that which was quoted to the user (which is not in the bid/ask spread or fair market price, but rather in the escalated estimated price that is only shown after the customer submits the market order).[19] "By example, if the user is quoted $10,040 and the router is able to fill at $10,030, Voyager may price improve the user's order to $10,035 (note: share of price improvement is variable and is determined by Voyager's proprietary fills algorithm)."[20]

---

[16] *See* "Passion for Product: Voyager Trading System," published Jan 23, 2020 at https://www.investvoyager.com/blog/passion-for-product-trading/ (accessed May 8, 2023).

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

83.     In reality, and unbeknownst to customers, the "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" intentionally were designed to provide Voyager with hidden commissions on every trade, that in most cases, would exceed the disclosed fees and commissions charged by its competitors. Voyager unfairly gained an edge on its competition and overcharged customers by collecting these secret commissions to the detriment of its unknowing customers.

84.     In addition, Voyager's representations about providing the best execution of trades across the marketplace and "Better Pricing on Trades" across the exchanges are demonstrably false. Numerous other exchanges provide better rates. For the vast majority of transactions that users performed on Voyager, such users could have obtained better pricing from other cryptocurrency exchanges. In fact, the rates Voyager offers would result in a plainly worse deal to users, often to the tune of nearly or more than 1% higher than competitors, even on highly liquid products.

85.     Voyager also represents to the public on its website that it is "publicly traded, licensed, and regulated." What Voyager fails to disclose in proximity to its advertising claim that it is "publicly traded," however, is that Voyager Digital, LLC's parent company, Voyager Digital Ltd., is publicly traded *in Canada,* not the U.S. Thus, Voyager's advertising claim that it is "publicly traded" is inaccurate with respect to Voyager Digital, LLC, which is not a publicly traded entity, and creates a misleading impression with respect to Voyager Digital, LLC's regulatory status, particularly because Voyager's website notes that "[a]ll services [are] provided by Voyager Digital, LLC." Voyager's claim to be "licensed" stems from state licensing in far fewer than all U.S. states as a money transmitter, or money services business, which is unrelated to Voyager's offering and selling of unregistered securities and conveys the impression to unsophisticated investors that Voyager is "licensed" to offer and sell such securities, when it is not.

### D.  Voyager's Products Are Unregistered Securities.

86.     On October 23, 2019, Voyager began offering the EPAs to public investors.

87.     From October 23, 2019, until Voyager declared bankruptcy on July 5, 2022, every account sold to customers of Voyager was necessarily an EPA, unless the customer took affirmative steps to separately "opt out" of having an EPA. There was no separate step necessary to opt in to having an EPA, there was no separate type of Voyager account to choose from when signing up for the account immediately after downloading the app (which was only available by

phone, no desktop application for computers or any other devices). Ehrlich did not know the process, nor did he know how many opted out, though he admitted Voyager had that information. Upon information and belief, the amount of customers who "opted out" of having an EPA is de minimis, and it is even possible that there were no opt outs.

88.     Voyager initially launched the EPAs for customers holding Bitcoin and subsequently expanded its EPA program to provide high rates of return to users who maintained a variety of crypto assets in their Voyager accounts. Through the pervasive promotions, advertisements, and solicitations by Voyager and Defendants, the EPAs became one of the most popular crypto-related investments nationwide, particularly for novice investors.

89.     Voyager solicits retail investors to invest in the Voyager EPAs by depositing certain eligible investments into the EPA. Voyager then pools these cryptocurrencies together to fund its various income generating activities, including lending operations, proprietary trading, cryptocurrency staking, and investments in other cryptocurrency trading platforms. In exchange for investing in EPAs, investors are promised monthly returns and interest.

90.     The vast majority of assets on the Voyager Platform consisted of EPAs. Voyager's own documents stated that its "users are automatically enrolled in the Voyager Earn Program" and would earn interest if they: "Simply maintain the required minimum monthly average balance of any of our reward-bearing digital assets to participate. Rewards are paid out on assets monthly and deposited directly into your Voyager account." Voyager's CEO, Steve Ehrlich, testified that he had no idea what percentage of new users opted out of the EPA program or whether it was more or less than 1%. He never cared what the number was and did not even know what the process was to opt out.

91.     Voyager also operated a "Loyalty Program." Under that program, and "depending on [users'] loyalty tier," users could double or triple the amount of their "annual rewards boost paid in" Voyager Token (VGX) for holding certain assets on the Voyager Platform. VGX in turn, was Voyager's propriety cryptocurrency token whose value (and therefore the value of the "annual rewards boost" paid to Voyager users) was substantially linked to the ability of Voyager and Defendants to successfully promote Voyager's platform and its products.

92.     To obtain the promised value of VGX rewards, Plaintiffs had to give something of value to Voyager. For example, Plaintiffs purchased VGX tokens from Voyager using traditional fiat currency or other forms of cryptocurrency.

93.     The rates of return associated with EPAs reflected Plaintiffs' participation in earnings resulting from Voyager's use of Plaintiffs' funds. Voyager explained:

> We will lend, sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of funds and cryptocurrency assets to counterparties, and we will use our commercial best efforts to prevent losses.

> In consideration for the interest earned on your account, you grant the right, subject to applicable law, without further notice to you, to hold the cryptocurrency held in your account in the firm name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk.

94.     The investors' success was linked to the success of Voyager, including because Plaintiffs expected to receive returns for investing in cryptocurrency on the Voyager Platform, and the returns were dependent on Voyager's use and investment of Plaintiffs' assets.

95.     On information and belief, when Plaintiffs and other investors transferred cryptocurrency tokens to Voyager, the assets were pooled together and investors shouldered the risks associated with the platform and other platforms and/or entities to which Voyager would "lend, sell, pledge, rehypothecate, assign, invest, use, commingle," etc., investors' assets while using Voyager's "best efforts" to provide financial returns.

96.     Both Voyager and Defendants, acting as agents and/or partners of Voyager, prominently touted that cryptocurrency holdings on Voyager would earn rates of return of up to 9% or more. All Plaintiffs had to do was fund the investment, which allegedly could be done in three minutes. The investors had no material involvement generating the advertised profits. These passive investment returns were a primary focus of Defendants' paid promotions and solicitations directed at Plaintiffs.

97.     The EPAs constituted "securities" as defined by state and federal securities laws. Although Voyager promised its investors a fixed return for their EPA investments, Voyager's Annual Information Form filed with Canadian regulators stated, "Rewards earned on crypto assets are variable, and reward rates are determined by Voyager at its sole discretion." To generate those "variable" rates of return, Voyager pooled the EPA assets and engaged in risky financial activities.

98.     The more transactions conducted on the Voyager Platform, the more profit Voyager made by taking commissions (i.e., by manipulating the price at which the trade was executed). On

information and belief, Voyager used some portion of that revenue, directly or indirectly, in combination with revenue generated from undisclosed high-risk loans or other activity to finance interest that Voyager was paying on EPAs.

99.    Notwithstanding Voyager's misleading claims to be licensed and regulated, Voyager's EPAs were neither licensed nor regulated by state or federal securities regulators, even though it is a security required to be registered.

100.    The absence of any registration statement meant that Plaintiffs and other investors lacked material information about the Voyager EPAs. The missing material information included, among other things, the business and financial condition of Voyager, the fees charged, the extent of Voyager's profits, and specific and detailed risks of the investment, including how Voyager determined to lend or stake investor tokens and the extent of liquidity reserves, or whether investor's crypto investments are put to some other use.

101.    Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*") and by the SEC, sources of authority that state courts around the country look to in construing their own analogous state securities laws, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

102.    Both the EPAs and Voyager's VGX tokens are clearly securities under the *Howey* test. Notably, the SEC has publicly claimed that VGX tokens are unregistered securities.[21]

103.    As to the first prong, courts applying *Howey* have consistently found that an exchange of crypto assets constitutes an "investment of money." *See Hodges v. Monkey Cap., LLC*, No. 17-81370-CV, 2018 WL 9686569 (S.D. Fla. Aug. 14, 2018) (investment of Ether or Bitcoin was "investment of money"); *Friel*, 2023 WL 2162747, at *9 ("[Plaintiff's] PSLRA Certification establishes he spent considerable money purchasing Moments [NFTs] from [defendant].'"). In the

---

[21] *SEC v. Coinbase, Inc., et al.*, No. 1:23-cv-04738, ECF No. 1 (S.D.N.Y. June 6, 2023), accessible at www.sec.gov/files/litigation/complaints/2023/comp-pr2023-102.pdf (defining VGX as one of the "Crypto Asset Securities," at ¶114, and conducting full *Howey* analysis at ¶¶270–82.") (acc. January 24, 2024).

case of EPAs, participants' deposit of fiat currency and other forms of cryptocurrency with Voyager clearly constitutes an investment of assets.

104.    As to the second prong, when Plaintiffs and other investors deposited cryptocurrency tokens with Voyager, Voyager would pool together those assets to fund its various income generating activities, including lending operations, proprietary trading, cryptocurrency staking, and investments in other cryptocurrency trading platforms. In exchange, Voyager promised EPA owners "rewards," through programs such as the "Voyager Earn Program," which would pay a variable rate of interest on any assets deposited in the EPA, and "Loyalty Program, which allowed EPA depositors to double or triple the amount of the rewards payable in Voyager's proprietary token (VGX). The rates of return Voyager paid customers on EPAs were dependent on Voyager's success in managing its income generating activities.

105.    The rewards earned on crypto assets were variable and the reward rates were determined by Voyager at its sole discretion. So, investors were dependent upon Voyager's success in managing its various income generating activities to achieve any return on their investments.

106.    Additionally, Voyager's pooling and reinvestment of depositor assets back into its business was intended to increase the interest rate and rewards that depositors received, thus "[tying] the fortunes of each investor in a pool of investors to the success of the overall venture."

107.    As to the third prong, clearly purchasers of EPAs and VGX expected profits. The Voyager EPAs represented individual accounts where customers invested their assets with the expectation of earning interest, regardless of their ability to withdraw assets. This interest was based on market rates, "determined by Voyager at its sole discretion," and was offered as an investment incentive for customers.

108.    Voyager's main selling point for both EPAs and VGX is that purchasing either entitled users to earn "rewards" on the Voyager Platform. For example, EPA purchasers could earn up to 9% interest on USDC held in their EPAS, and VGX holders were entitled to earn 7% of VGX held in their account per year.

109.    Use of the word "rewards" is misleading; in this case, as it is the exact same thing as interest. Thus, the company was marketing that EPA and VGX holders could earn interest on their holdings, thus clearly communicating a profit opportunity (one they made sound like was risk free). Voyager never explains where these "rewards" came from. Rather, they just claim that they are delivered from the Voyager's "treasury." This means absolutely nothing. The only way rewards

could be paid is either the company created new VGX tokens out of thin air to pay "rewards," or pooled user VGX tokens and other cryptocurrency tokens and loaned them out to other parties and paid interest, minus a spread, to EPA and VGX token holders. Either way, Voyager's efforts are critical to the success of the EPA and VGX endeavours.

110.    Voyager EPA holders, like Plaintiffs, received market-based interest payments designed to retain them as customers. Voyager's ongoing efforts to set competitive interest rates, attract customers, and maintain their interest in EPAs influenced EPA holders' profit expectations, establishing a link between Plaintiffs' profit expectations and Voyager's efforts. Voyager's promotional campaigns and advertising influenced the attractiveness of EPAs, and the market-based interest rates Voyager offered, which further illustrates that the profits *were* derived from Voyager's efforts.

111.    Put simply, Voyager EPA holders, like Plaintiffs, reasonably expected to earn profits based on the efforts of Voyager where Voyager: (i) actively marketed EPAs as a means of earning a higher return; (ii) engaged in a public campaign to encourage retail and institutional investors to invest in EPAs; (iii) touted its own abilities within the marketplace to generate handsome returns for users who invested in EPAs; and (iv) influenced investor decisions to invest to invest in EPAs

112.    Voyager also made it clear that VGX tokens were tradeable on secondary exchanges, including the world's largest crypto exchange, Binance. The presence and marketing of secondary trading is another way the company led users to believe they could expect to profit off VGX. Even the "Framework for "Investment Contract" Analysis of Digital Assets" lists the following factor as making it more likely "that there is a reasonable expectation of profit" under this circumstance: "The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future."[22]

113.    Voyager has argued that VGX tokens are akin to airline miles, but a key difference is that airlines miles are NOT tradeable on a secondary market. Note that the "Framework" acknowledges this point as well in footnote 19. Furthermore, Voyager cannot plausibly argue VGX

---

[22]    https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (accessed May 8, 2023).

is a utility token when anybody could have used the Voyager platform without ever having to hold VGX.

114.     Clearly, Voyager's efforts were instrumental in making its EPAs and VGX worth anything at all. This is obvious for VGX when you consider the fact that the price of VGX plummeted once Voyager filed for bankruptcy. Voyager played the most critical role in generating the "rewards" paid pursuant to the EPAs and in making VGX work, including:

   i.     Voyager was responsible for paying "rewards."

   ii.    Holders of New VGX would rely on the company to be the administrator to maintain features and rewards of VGX.

   iii.   All VGX "rewards" are tied to use of the Voyager platform, such as 7% rewards on VGX tokens, trades executed on Voyager or using a Voyager debit card. Voyager therefore needs to be a functioning company for these "rewards" to have any value.

   iv.    The fact that Voyager was able to execute a "swap" of old VGX for new VGX makes clear that Voyager solely controlled the issuance and destruction of VGX tokens and could do whatever they wanted, whenever they wanted. Voyager administered the swap contract that executes the "swap" and could turn the swap on and off at a moment's notice.

115.     Similarly, under the "family resemblance" test set forth in *Reves v. Ernst & Young*, 494 U.S. 56 (1990) ("*Reves*"), an instrument is *presumed* to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance to one of the categories of instrument identified by the Second Circuit in the case of *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976): the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note that simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[, and] … notes evidencing loans by commercial banks for current operations. The Supreme Court in *Reves* listed four factors to determine whether an instrument bears a strong resemblance to the instruments on the list: (1) the motivation that would prompt a reasonable seller and buyer to enter into the transaction; (2) the distribution plan of the instrument;

(3) the reasonable expectations of the investing public; and (4) the existence of another regulatory scheme that significantly reduces the risk of the instrument.

116.     Voyager sold investment contracts without registering the offer or sales with state or federal regulators, including the SEC, as required by law, and no exemption from the registration requirement applied.

### E.   Regulatory Enforcement Actions Confirm that Defendants Were Promoting Unregistered Securities.

117.     Both Voyager and Defendants knew or should have known that the objective of their partnership, and the promotional activity they undertook together, constituted promoting unregistered securities.

118.     Both before and after Defendants began soliciting investments in Voyager's digital assets, there was significant national attention to the fact that cryptocurrency investment products substantially identical to Voyager's products were investment contracts that constituted securities under both federal and state law, including New Jersey law that applies here for all class members nationwide.

#### i.   BlockFi Order

119.     On July 20, 2021, the New Jersey Bureau of Securities published a press release that received media attention titled "New Jersey Bureau of Securities Orders Cryptocurrency Company 'BlockFi' to Stop Offering Interest-Bearing Accounts."[23]

120.     The Bureau stated that it was ordering the "financial services company based in Jersey City from selling unregistered securities in the form of interest-earning cryptocurrency accounts"; and that the company had been funding its "cryptocurrency lending operations and proprietary trading at least in part through the sale of unregistered securities in violation of the Securities Law."[24]

---

[23]           https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-company-voyager-digital-to-stop-offering-and-selling-interest-bearing-accounts/ (accessed May 8, 2023).

[24] https://www.nj.gov/oag/newsreleases21/BlockFi-Cease-and-Desist-Order.pdf (accessed May 8, 2023).

121.    The Bureau announced that "Cryptocurrency investment products offered and sold on decentralized finance platforms carry significant risks, even beyond those associated with the volatility of cryptocurrency . . . Platforms like BlockFi may mirror the traditional financial structures that we know and trust, but in reality they can leave investors extremely vulnerable."

122.    Voyager's products functionally mirror what BlockFi was offering, i.e., the opportunity to invest in an "interest account by depositing certain eligible cryptocurrencies – including Bitcoin and Ethereum – into accounts at BlockFi. BlockFi then pools these cryptocurrency deposits together to fund its cryptocurrency lending operations and proprietary trading. In exchange for investing in the BlockFi Interest Accounts, investors are promised an attractive interest rate that is paid monthly in cryptocurrency."

123.    In material respects, the financial products offered by Voyager were the same as BlockFi accounts that were unregistered securities under New Jersey law.

### ii. Celsius Order

124.    On September 17, 2021, New Jersey regulators published a press release that received media attention titled "New Jersey Bureau of Securities Orders Cryptocurrency Firm Celsius to Halt the Offer and Sale of Unregistered Interest-Bearing Investments."[25] The Bureau stated that the cryptocurrency platform "has been funding its cryptocurrency lending operations and proprietary trading at least in part through the sale of unregistered securities in violation of the New Jersey Securities Law" and that "[i]f you sell securities in New Jersey, you need to comply with New Jersey's investor-protection laws."

125.    As described by the Order in New Jersey, Celsius's interest bearing program was substantially the same as Voyager's EPAs in all material respects. The Bureau pointed out that "Earn Rewards investors can earn a variable interest rate on their investment and may withdraw their digital assets at any time, subject to a maximum three-day processing time specified by Celsius." Celsius offered returns that were "tiered depending upon the nature and amount of cryptocurrency invested, as explained on the Celsius Website."

---

[25]    https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-firm-celsius-to-halt-the-offer-and-sale-of-unregistered-interest-bearing-investments/ (accessed May 8, 2023).

126.    The Bureau's Order also emphasized that the Earn Rewards program were promoted as "long-term investments" as evidenced by the statement on Celsius's homepage: "Start earning top rates on any amount of crypto and get paid every paid every [sic] Monday to keep 'HOLDing.'" Celsius encouraged users to hold their investments instead of selling or trading as "it would be a mistake to sell at this early stage." (Voyager also encouraged Plaintiffs to "hold" their digital asset investments.)

127.    Much like Voyager, Celsius did "not disclose to investors: (a) the amount of money devoted to each of these investment activities; (b) the nature and creditworthiness of the borrowers, as well as the identity of any borrowers to whom Celsius has lent material amounts of cryptocurrency; (c) the terms and duration of the loans; (d) the types of securities and digital assets it trades; or (e) the profits or losses derived from these activities."

128.    The Bureau concluded that the "Earn Rewards product is a security as defined in section 49:3-49(m) of the NJUSL. The Earn Rewards product was and is required to be registered with the Bureau pursuant to section 49:3-60 of the NJUSL. The Earn Rewards product has not been registered with the Bureau, is not exempt from registration, and is not federally covered. Celsius has offered and sold unregistered securities in violation of section 49:3-60 of the NJUSL and continues to do so."

### iii. Kraken Order

129.    On February 9, 2023, the SEC published a press release that received media attention titled "Kraken to Discontinue Unregistered Offer and Sale of Crypto Asset Staking-As-A-Service Program and Pay $30 Million to Settle SEC Charges."[26] The SEC announced that it had charged the entities known as Kraken "with failing to register the offer and sale of their crypto asset staking-as-a-service program, whereby investors transfer crypto assets to Kraken for staking in exchange for advertised annual investment returns of as much as 21 percent," and that the Kraken entities, to settle the SEC's charges, "agreed to immediately cease offering or selling securities through crypto asset staking services or staking programs and pay $30 million in disgorgement, prejudgment interest, and civil penalties."

---

[26] https://www.sec.gov/news/press-release/2023-25 (accessed May 8, 2023).

130.     The SEC detailed Kraken's "staking services," in which "Kraken pools certain crypto assets transferred by investors and stakes them on behalf of those investors. Staking is a process in which investors lock up—or 'stake'—their crypto tokens with a blockchain validator with the goal of being rewarded with new tokens when their staked crypto tokens become part of the process for validating data for the blockchain. When investors provide tokens to staking-as-a-service providers, they lose control of those tokens and take on risks associated with those platforms, with very little protection." The SEC alleged that "Kraken touts that its staking investment programs offers an easy-to-use platform and benefits that derive from Kraken's efforts on behalf of investors, including Kraken's strategies to obtain regular investment returns and payouts."

131.     The SEC's action confirms that the types of crypto products offered by Voyager were securities. The press release quotes SEC Chair Gary Gensler stating, "Whether it's through staking-as-a-service, lending, or other means, crypto intermediaries, when offering investment contracts in exchange for investors' tokens, need to provide the proper disclosures and safeguards required by our securities laws. Today's action should make clear to the marketplace that staking-as-a-service providers must register and provide full, fair, and truthful disclosure and investor protection."

### iv. Voyager Order

132.     On March 29, 2022, New Jersey regulators published a press release that received media attention titled "New Jersey Bureau of Securities Orders Cryptocurrency Company 'Voyager Digital' to Stop Offering and Selling Interest-Bearing Accounts."[27]

133.     The Bureau announced that it was ordering the "Jersey City-based financial services company from selling unregistered securities in the form of interest-earning cryptocurrency accounts that have raised at least $5 billion nationwide," and that the company had been allegedly funding its "income generating activities—including lending operations, digital asset staking, and proprietary trading—at least in part through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts in violation of the Securities Law."

---

[27]     https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-company-voyager-digital-to-stop-offering-and-selling-interest-bearing-accounts/ (accessed May 8, 2023)

134.    The Bureau stated, "Unregistered securities offerings pose significant risk to investors because the issuers do not make the same types of disclosures, including, for example, providing detailed financial statements that typically accompany registered offerings." The Bureau detailed how "[i]nvestors in unregistered offerings like the 'Voyager Earn Program Accounts'…may not receive any information about the specific investment strategies used by the issuer to generate investment returns, may not be advised about the creditworthiness of counterparties with whom the issuer does business, and may not be apprised of the use of leverage, or other risky investment strategies employed by the issuer to generate a return."

135.    The Bureau outlined that "Voyager solicits investors to invest in the Voyager Earn Program Accounts by depositing certain eligible cryptocurrencies into the investors' Voyager account. Voyager then pools these cryptocurrencies together to fund its various income generating activities, including lending operations, digital asset staking, proprietary trading, and investments in other cryptocurrency platforms, such as Celsius Network. In exchange for investing in the Voyager Earn Program Accounts, investors are promised an attractive interest rate that is paid monthly in the same type of cryptocurrency as originally invested."

### F. Recent Enforcement Actions Against Crypto Influencers Confirm that Defendants Were Required to Disclose Their Payments from Voyager.

136.    Recently, the SEC reached a settlement with former professional basketball player and sports analyst Paul Pierce for touting on Twitter for a two-week period in 2021 a "crypto asset security" that was being offered and sold. Although not related to Voyager, the SEC's findings are instructive about what kind of activity violates the securities laws:

> Pierce, at least negligently, made materially false and misleading misstatements in his Twitter posts promoting the crypto asset security, including statements regarding the amount he had earned from holding the crypto asset security, and statements indicating that he was holding—and intended to increase—his investment in the crypto asset security while contemporaneously selling the securities. Pierce's conduct violated Section 17(a)(2) of the Securities Act, which prohibits obtaining money or property by means of an untrue statement of a material fact or any omission of material facts necessary to make statements made not misleading in the offer or sale of securities.

> In addition, Pierce did not disclose that he was being compensated by the entity offering and selling the security for giving the crypto asset security publicity. Pierce's failure to disclose this compensation violated Section 17(b) of the Securities Act, which makes it unlawful for any person to promote a security

without fully disclosing the receipt and amount of such consideration from an issuer.[28]

137.     The Paul Pierce case was not the only time an influencer was fined for non-disclosure. On October 22, 2022, the SEC reached a settlement with Kim Kardashian for touting on Instagram a "crypto asset security" that was being offered and sold by EthereumMax without disclosing the payment she received for the promotion.

138.     Although not related to Voyager, the SEC's findings are instructive about what kind of activity violates the securities laws:

> On June 13, 2021, Kardashian—a well-known media personality and businesswoman—touted on social media a crypto asset security that was being offered and sold. Kardashian did not disclose that she was being compensated for giving such security publicity by the entity offering and selling the security. Kardashian's failure to disclose this compensation violated Section 17(b) of the Securities Act, which makes it unlawful for any person to promote a security without fully disclosing the receipt and amount of such consideration from an issuer. Kardashian's crypto asset security promotion occurred after the Commission warned in its July 25, 2017, DAO Report of Investigation that digital tokens or coins offered and sold may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. 2 The promotion also occurred nearly four years after the Commission's Division of Enforcement and Office of Compliance Inspections and Examinations issued a statement reminding market participants that "[a]ny celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws.[29]

**G.   Voyager's Bankruptcy and Related Litigation.**

139.     On December 24, 2021, counsel for Plaintiffs and the class members brought the first (and only) putative Nationwide Class Action complaint against Voyager, *Mark Cassidy v. Voyager Digital, et al.,* No. 1:21-cv-24441, ECF No. 1 (S.D. Fla. Dec. 24, 2021) (Altonaga, C.J.).

---

[28] *In re* Pierce, SEC Admin. Proceeding File No. 3-21305 (Feb. 17, 2023) (summary of order instituting cease-and-desist proceedings at paras. 1–2).

[29] *In re* Kardashian, SEC Admin. Proceeding File No. 3-21197(Oct. 3, 2022) (summary of order instituting cease-and-desist proceedings at para. 1).

In that complaint, the plaintiffs alleged that Ehrlich teamed up with Defendants Cuban and the Mavericks to promote Voyager by making false representations and employing other means of deception.

140.   The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting the Voyager Platform—received national attention.[30]

141.   After the *Cassidy* Complaint was filed, the following important actions took place: (a) the SEC began an enforcement review focused on whether Voyager's EPAs constitute unregistered securities; (b) seven state Attorney Generals (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) found that Voyager was violating their state laws, including finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022 (thousands of these EPAs were Florida-based) and that the EPAs are an unregistered security; and (c) on March 29, 2022, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the Earn Program is not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[31]

142.   On July 5, 2022, Voyager and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York.

---

[30] *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

[31]   https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed May 8, 2023); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed May 8, 2023).

143.     On September 28, 2022, Voyager filed a motion in the Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (b) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates. However, this deal fell through when FTX imploded in November 2022, upon revelation that FTX had been perpetrating a massive fraud on its own cryptocurrency exchanges. Binance followed with a $1.3 billion offer for Voyager's assets in the bankruptcy, but rescinded its offer in April 2023.

**H.  The Deceptive and Unlawful Promotions.**

144.     Voyager's rapid growth in 2021 and 2022 was made possible due to the sustained and aggressive promotion and advertising campaign by Cuban and the Mavericks (which were authorized and approved by the NBA), as well as other celebrity promoters.

145.     Promoters collectively were paid millions of dollars in cash and VGX crypto currency (among other crypto currencies) to broadly solicit potential investors with promotional statements, contests, coupon codes, offers of free cryptocurrency, sign-up incentives, and other strategies to entice people to purchase cryptocurrency on Voyager, including express or implied solicitations for their fan bases to purchase EPAs, which were unregistered securities.

146.     These Voyager celebrity agents included Mark Cuban and the Dallas Mavericks. Some Plaintiffs to this action have sued Cuban and the Mavericks in this district in the Related Cases, as in *Karnas*. Voyager, Cuban, the defendants in the Related Cases, and Defendants in this action, were engaged in a common civil conspiracy against Plaintiffs and the Class Members to profit from Voyager's fraud and other wrongdoing.

147.     There is no question that the Maverick's NBA-approved promotions were touting EPAs, regardless of whether their advertisements expressly referenced EPAs. The promotions advertised the interest rates between 7% and 12% Voyager offered on crypto assets, interest rates available only to EPA account holders. Additionally, as described above, all users were automatically signed up for an EPA unless they expressly opted out (to date discovery has not revealed any evidence of a single opt out). For example, then-Mavericks owner Cuban specifically touted the EPAs during the October 27, 2021 press conference, explaining

You can convert to put it into a USDC stablecoin on Voyager, and I thought it was 7% but now it's 9%. And so I've taken a lot of my cash and made it available on USDC. I'm not here trying to sell you it's 100% risk free, but it's as close to risk free as you're going to get in the crypto universe. And so just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.

148. Cuban made several other statements touting the relative safety and quality of investing in an EPAs with Voyager.

149. The NBA and Mavericks knew that their endorsements of Voyager would influence people because of their substantial professional accomplishments and celebrity status. The NBA has more than 85 million followers across social media, and the Mavericks have over 3.5 million followers.

150. Moreover, the NBA and Maverick's own financial interests depended on getting users to sign up for Voyager—not only because they had been paid for performing that service, but also because they had expectations of being long-term brand ambassadors for Voyager under a lucrative sponsorship contract. The NBA stood to benefit from the Voyager token's long-term growth and success.

## I. ROLE OF DEFENDANT NATIONAL BASKETBALL ASSOCIATION

### A. The NBA's Global Reach and Sponsorship Policies

151. The NBA is a global sports and media business built around four professional sports leagues: the National Basketball Association (NBA), the Women's National Basketball Association (WNBA), the NBA G League, and the NBA 2K League.

152. The NBA has established a major international presence with games and programming available in 215 countries and territories in more than 50 languages, and merchandise for sale in more than 100,000 stores in 100 countries on six continents. NBA rosters at the start of the 2021-22 season featured 109 international players from 39 countries.

153. The NBA has one of the largest social media communities in the world, with 1.9 billion likes and followers globally across all leagues, team, and player platforms. Through NBA Cares, the league addresses important social issues by working with internationally recognized youth-serving organizations that support education, youth and family development, and health-related causes.

154. The NBA operates with a revenue sharing system to prevent economic disparity among its franchises. The NBA generates hundreds of millions of dollars in revenue from

corporate sponsorships, including official NBA brand deals, and rights to the home of the stadiums where the NBA teams play.

155.    As part of its funding scheme, the NBA encourages its member teams to negotiate international sponsorship arrangements, and shares in the revenue derived from such partnerships. The NBA has laws and policies governing how its teams work with companies interested in becoming sponsors.

156.    Notably, in an effort to help its teams cope and recover revenue losses caused by the pandemic, the NBA expanded its strict rules to allow its teams to sell international sponsorship rights. The NBA's president of team marketing and chief innovation officer, Amy Books, explained that the NBA's decision to allow clubs to sell international sponsorship rights allows teams to "take advantage of the global reach of team partners and to create more targeted non-game content."[32]

157.    The NBA had financial incentive to adopt this new strategy, as it would provide an opportunity increase team revenue (in which the NBA shares).

**B.   The Impact of COVID-19 on the NBA**

158.    The COVID-19 pandemic had a devastating financial impact on the NBA and its teams. Stadiums were closed to fans, the 2019-2020 season was cut short, and the players were placed in a $180 million "bubble."[33] The future of sports entertainment was uncertain.

159.    In fact, at the time the season was suspended in March 2020, there were still 259 games left in the 2019-2020 NBA regular season. The NBA estimated lost revenues during the 2019-2020 season at $1.5 billion.[34] Combined league gate revenues lost as a result of these cancellations was estimated at between 350 and 450 million U.S. dollars.[35] One report estimated

---

[32]    https://www.sportspromedia.com/news/nba-teams-sell-international-sponsorship-rights/

[33]    https://fortune.com/longform/nba-bubble-2020-orlando-florida-disney-covid-19-coronavirus-pandemic-los-angeles-lakers-lebron-james-basketball/

[34]    https://apnews.com/article/basketball-business-nba-health-coronavirus-pandemic-f1f9709802130efe9525a487ea65a56d

[35] https://www.statista.com/statistics/1104004/coronavirus-revenue-loss-nba/

the NBA lost $800 million in gate receipts and an additional $400 million loss in sponsorship and merchandise sales.[36]

160.     These losses seemed slight when considering what awaited the NBA in the 2020-2021 season if it were to advance without gate-night receipts—which the NBA told teams would result in a projected a 40% loss in overall revenue, or approximately $4 billion loss.[37]

161.     During this time, NBA Commissioner Adam Silver was quoted as stating that the COVID-19 pandemic could be "the death knell" of the NBA.

**C.   The NBA Turns to Crypto**

162.     As the NBA sought to rebound from the ravages of the COVID-19 pandemic, and as part of its effort to continuously increase its viewership, partnerships that reached the statistically-less-sports-interested younger populations became especially valuable. The cryptocurrency industry afforded the league an opportunity to target those demographics.

163.     The NBA was also the perfect partnership candidate from the cryptocurrency market's perspective. In December 2021, it was reported that just under 50% of NBA fans were interested in crypto products, with 46% intending to use crypto products that year, which was 61% higher than the overall U.S. population.[38]

164.     As one commentator advised, "[a]s individuals become more educated about cryptocurrencies and NFTs, partnerships with these brands are going to continually improve in value. NBA teams should look to get in now and take advantage of these opportunities, especially while leagues like the NFL continue to hinder their affiliate teams from partnering with these brands."

165.     Despite the well-known risks involved with crypto sponsors, the NBA became an early adopter in cryptocurrency and NFT partnerships.[39] This was during a time when some

---

[36] https://www.espn.com/nba/story/_/id/30211678/nba-revenue-2019-20-season-dropped-10-83-billion-sources-say

[37] *Id.*

[38]     https://www.nielsen.com/insights/2021/slam-dunk-how-crypto-brands-are-making-a-splash-with-the-nba-and-fans/

[39] In July 2019, the NBA announced the launch of NBA Top Shot, a joint venture between

leagues, such as the NFL, were outright banning cryptocurrency partnerships because of the crypto industry's uncertainty and volatility. In August 2021, for example, the NFL told its teams that they could not sell sponsorships to cryptocurrency trading firms or sell non-fungible tokens. The guidelines stated that "Clubs are prohibited from selling, or otherwise allowing within club controlled media, advertisements for specific cryptocurrencies, initial coin offerings, other cryptocurrency sales or any other media category as it relates to blockchain, digital asset or as blockchain company, except as outlined in this policy."[40] The NFL wanted to be "deliberate and strategic" if they were going to move into the cryptocurrency space, a choice of operation that the NBA completely ignored.

166.    In the 2021-2022 season, the NBA's second largest category of sponsorships came from the crypto industry, helping bring the NBA's sponsorship revenue to a record $1.6 billion.[41] Cryptocurrency brands spent more than $130 million on NBA deals during the 2021-2022 season[42] and had partnerships with at least 24 of the NBA's 30 affiliated teams.

167.    For example, starting with the 2021-22 NBA season, Miami Heat's home stadium in downtown Miami, Florida was re-named the "FTX Arena." The cryptocurrency exchange had purchased the naming rights to the Miami Heat's arena (which was formerly named American

---

itself, the NBA players association, and Dapper Labs. Top Shot is a blockchain application to sell NFT's called "Moments." Moments are digital video clips of highlights from NBA games. In May 2021, plaintiffs Gary Leuis and John Austin, on behalf of all others similarly situated, filed suit against Dapper Labs, alleging that Dapper Labs violated federal securities laws by offering Moments without filing a registration statement with the SEC. On February 22, 2023, Judge Victor Marrero in the Southern District of New Your rejected defendant's motion to dismiss on the grounds that Moments are securities.

[40]   https://theathletic.com/4200949/2021/09/03/nfl-to-teams-no-cryptocurrency-nft-deals-for-now-as-league-eyes-digital-market/?redirected=1

[41]   https://www.cnbc.com/2022/06/01/crypto-deals-help-fuel-nba-sponsorship-money-to-1point6-billion-.html

[42]                                                       https://sports.yahoo.com/inside-ftx-now-shaky-135-050100639.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuYmluZy5jb20v&guce_ref errer_sig=AQAAALRBOFbCSv8kpw6q2t0yCyUf3mJpmm78mY0sIm5UPAGZgIEFumDWgsf MWofdMAQn7r4Wg8VFw-A23Z5NE0SM_k2J9fzZajqxt_3zxNztP3p-3HBb2Du4Zqm9JnrnDOHE6RchkHXLrLXJxXFrbYyqh4jg9V2emwtSikayvEY7iqkE

https://www.sportspromedia.com/news/nba-teams-sponsorship-revenue-income-2021-22-cryptocurrency/?zephr_sso_ott=w2MEe2

Airlines Arena).[43] This was the NBA's first every crypto sponsorship of one of its team's arenas,[44] and the first time any United States sports arena bore the name of a cryptocurrency exchange.

168.    In mid-2021, the NBA's Miami Heat also officially announced that it had entered into a long-term partnership with cryptocurrency exchange FTX US, making FTX US "The Official and Exclusive Cryptocurrency Exchange Partner of the Miami HEAT."[45] By partnering with the Miami Heat, FTX US planted their flag both on the global sports landscape and in Miami. Importantly, this deal was only possible because the NBA gave its final approval.[46]

169.    In announcing the NBA team's partnership, Eric Woolworth, President of The HEAT Group's Business Operations stated: "FTX.us is an exciting, young company in an emerging category of the financial services industry that continues to grow at lightning speed, and we are ecstatic to welcome them with open arms to the Magic City. This is a ground-breaking, first-of-its-kind partnership in our industry that will draw global attention."

170.    FTX's Chief Operating Officer, Sam Bankman-Fried was quoted as saying: "Internet technology and digital finance are evolving incredibly quickly. We wanted to partner with a city and a franchise that are dynamic, diverse, innovative and always forward-looking . . . When it comes to those qualifications, Miami and the HEAT are second to none. One of America's great cities and one of the world's most iconic teams are poised for an even brighter future, and we're thrilled to be a part of it."

171.    Miami's then-mayor Francis Suarez also expressed his excitement around the NBA's and Miami Heat's embrace of crypto, stating: "It's awesome that we've attracted a huge cryptocurrency exchange" and noting that FTX "complements the brand" that Miami was working to establish as a tech and crypto hub.[47]

172.    The Miami Heat's deal with FTX could only become effective with the explicit approval of the NBA. During the negotiation process, Miami Dade Commissioner Rene Garcia

---

[43] https://www.nytimes.com/2021/06/05/technology/miami-worship-bitcoin.html

[44] https://www.nytimes.com/2021/03/23/business/dealbook/miami-suarez-crypto.html

[45] https://www.nba.com/heat/news/heat-partners-with-ftxus

[46]      https://igaming.org/crypto/nba-approves-ftx-long-term-partnership-with-the-miami-heat-981/

[47] *Id.*

explained that there were still "a lot of questions whether the NBA will still approve of this."[48] FTX had the right to pull out of the deal if the NBA refused to give its permission for the company to put its logo on the Heat arena.[49]

173.    Ultimately, the NBA approved the Heat/FTX partnership, and Miami-Dade County approved the deal for the Miami Heat's arena to be renamed FTX Arena. To be clear, the NBA expressly approved the 19-year, $135 million sponsorship deal for naming rights of the stadium and allowed FTX's logo on the Heat's court and arena.

174.    After the deal had gone public, Bankman-Fried appeared on Miami's Local 10 News and commented: "**The NBA has approved the deal**. It's a great team with a great history and so I think it also felt like just a really good fit for us."[50] (emphasis added). FTX later moved its US headquarters to Miami, Florida.

175.    The partnership provided unprecedented exposure for FTX. Both the Miami Heat and NBA received a share of the payments made by FTX pursuant to the agreement to re-brand the Heat's arena.

176.    The NBA's approval and encouragement of crypto sponsorships led to other NBA teams and players entering into crypto partnership agreements, which, in turn, resulted in more exposure, trust, and investment in crypto nationwide.

177.    In July 2021, the NBA "landed its first cryptocurrency jersey sponsorship after the Portland Trail Blazers agreed to terms with crypto platform StormX."[51] The sponsorship deal allowed StormX to have a brand presence on the NBA's Portland Trail Blazers' game and practice jerseys, and signage in the team's arena. StormX would also create the team's first NFT. This multi-year deal was estimated to bring in millions of dollars for the NBA and Trail Blazers.

178.    In October 2021, the NBA itself announced a multiyear partnership with Coinbase Global, Inc., making Coinbase the exclusive cryptocurrency platform partner of the NBA,

---

[48]    https://www.local10.com/news/local/2021/03/27/nba-still-needs-to-approve-miami-dades-135m-deal-with-ftx-to-rename-miami-heats-home/

[49] https://patch.com/florida/miami/ftx-arena-deal-linked-fighting-gun-violence

[50]    https://igaming.org/crypto/nba-approves-ftx-long-term-partnership-with-the-miami-heat-981/

[51]               https://www.cnbc.com/2021/07/01/portland-trail-blazers-land-nbas-first-cryptocurrency-jersey-patch-deal.html

Women's National Basketball Association (WNBA), NBA G League, NBA 2K League and USA Basketball.[52] The deal provided for Coinbase to have a brand presence featured on nationally-televised NBA games.

179.    In November 2021, Crypto.com inked a twenty-year, $700 million deal for the naming rights to the home arena of the NBA's Los Angeles lakers and WNBA's Sparks.[53] The stadium name change took effect on Christmas day, when the Lakers hosted NBA Brooklyn Nets in the NBA's annual Christmas games, which were aired nationally on ABC and ESPN. The deal "link[ed] Crypto.com with one of the NBA's top brands, offering crucial brand awareness as the cryptocurrency platform positions itself to capture market share in the growing digital currency space."[54]

180.    In December 2021, the NBA's Golden State Warriors and FTX US announced a first-of-its-kind cryptocurrency partnership.[55] As part of the deal, FTX became the "Official Cryptocurrency Platform and NFT Marketplace" of the Warriors. The cryptocurrency exchange had also partnered with NBA Warriors' player Steph Curry who became a brand ambassador for FTX and received an equity stake for his promotional efforts.

181.    The Warriors' partnership agreement with FTX included terms that provided for FTX to have logo placement on the basket pole pads and press table for the Santa Cruz Warriors, the team's G League affiliate. For the Warriors' esports brands, FTX also had its logo virtually placed on the Warriors Gaming Squad court during NBA 2K League games.[56]

182.    In announcing the partnership, Warriors' President and Chief Operating Officer Brandon Schneider explained: "Cryptocurrency has a well-established worldwide community and is going to continue to be a major part of the sports, media and entertainment industries . . . In our conversations with FTX, we quickly realized our joint desire to innovate around cryptocurrency integration and adoption, including the role NFTs play in global fan engagement."[57]

---

[52] https://pr.nba.com/coinbase-nba-partnership/

[53]    https://www.cnbc.com/2021/11/17/cryptocom-buys-naming-rights-to-lakers-staples-center-in-a-700-million-deal-.html

[54] *Id.*

[55] https://cryptobriefing.com/ftx-partners-with-the-nbas-golden-state-warriors/

[56] https://www.nba.com/warriors/warriors-ftx-partnership-20211214

[57] *Id.*

183.    FTX US President Brett Harrison commented that FTX was "excited to partner with a franchise that aligns with our core values" and that FTX's NFT Platform would "provide a leading, safe and secure venue for the Warriors international fan base to access exclusive collectables from the franchise. Alongside the NFT drops, working with the Warriors will increase our ability to create a positive change, not only domestically but internationally, with one of the most prestigious professional sport franchises in the world."[58]

184.    By June 2022, the NBA's cryptocurrency partnerships had exploded. The NBA itself had inked a lucrative deal with Coinbase, worth $192 million over four years. And several teams signed significant, highly-publicized sponsorship deals. The Los Angeles Lakers agreed to a twenty-year naming rights contract worth $700 million with Crypto.com, and the Golden States Warriors signed a $10 million global rights agreement with FTX, plastering the FTX name across their court. FTX also secured the naming rights for the Miami Heat's arena in a nineteen-year, $135 million deal. Crypto.com sponsored the Philadelphia 76ers, and had deals with LeBron James and Joel Embiid. Webull, another crypto and financial services firm, sponsored the Nets, and Socios had marketing and fan engagement deals with 28 of the NBA's 30 total teams. These deals—authorized by the NBA— provided crypto exchanges (namely, FTX, Voyager, Coinbase, Webull, and Crypto.com) with a highly visible market presence, inclusive of logo and likeness, internationally.

185.    Overall, in 2022, crypto spending on NBA sponsorships increased more than 7,300% over the 2020-2021 season.[59] All these partnerships came to fruition notwithstanding the NBA's policies regarding cryptocurrency engagements.

186.    Pursuant to the NBA's own written policies on allowing its teams to promote the sale of digital assets like VGX or EPAs, the NBA required prior express written approval before any such deals could even be announced to the public. The NBA was supposed to only grant such approval after strict and specific requirements were met, including obtaining legal opinions on whether the digital assets were compliant with applicable SEC regulations and U.S. securities laws, and conferring with NBA counsel to ensure that the offerings withstood scrutiny.

---

[58] *Id.*

[59] https://decrypt.co/101998/nba-crypto-sponsorships-increased-7300-percent

187.    The NBA's embrace of cryptocurrency is particularly problematic given the devasting impact cryptocurrency has had on low-income communities and people of color. According to a study released in November 2022 by the Bank for International Settlements, around three-quarters of people who invested in Bitcoin between 2015 and 2022 lost money. Similarly, Pew reports that 46% of those who invested in cryptocurrency admit their investments have done worse than expected, while only 15% say they have done better than expected. Both surveys were conducted before the collapse of FTX, so the number of crypto investors who have suffered losses is surely higher now. The same Pew study found that "Asian, Black and Hispanic adults are more likely than White adults to say they have ever invested in, traded or used a cryptocurrency." A 2022 survey from Charles Schwab found that one-quarter of Black Americans own cryptocurrency, compared to 15% for White Americans. Particularly troubling was Schwab's finding that "Black investors are more than twice as likely to say cryptocurrency was their first investment" (11% of Black investors compared to 4% of White investors.) Even more troubling was the results of a survey conducted by Lending Tree which found that Black crypto investors were likelier than white crypto investors to say that they had borrowed money to make their investment and that they had sold their crypto for less than it was worth. In December 2022, JPMorgan Chase released a report that analyzed data from 600,000 checking account customers who had bought crypto and found "[m]ost individuals who transferred money to crypto accounts did so when crypto-asset prices were significantly higher than recent levels, and those with lower incomes likely made purchases at elevated prices relative to higher earners." Unfortunately, crypto losses have centered disproportionately on groups that have historically been excluded from the traditional financial system and the wealth-building opportunities it provides.

188.    The NBA is one the most popular sports for African Americans. Roughly 40% of African Americans identify as an "avid" NBA fan, while 36% identify as a "casual" fan.[60] And the NBA has long prided itself as a champion for racial justice. After the NBA season resumed during the pandemic-shorted season of 2019-20, "the NBA and the NBPA also worked collaboratively to allow players to wear a number of social justice messages on their jerseys during

_____

[60]    https://www.statista.com/statistics/1098410/interest-level-nba-ethnicity/    (accessed January 31, 2024)

the remainder of the season" and the NBA painted "Black Lives Matter" on the courts.[61] And in November 2020, the NBA and NBPA "announced the formation of the National Basketball Social Justice Coalition, an organization that will lead the NBA family's collective efforts to advance equality and social justice" by focusing on "voting access and criminal justice system reform at the national, state and local level."[62]

189.    By promoting a speculative product with no inherent value, the NBA contributed to significant losses by millions of their biggest fans, thus betraying their self-professed committed to equality and social justice. Through their actions, Defendants assisted Voyager in perpetuating the fraudulent scheme, misleading investors into investing with Voyager to Plaintiffs' detriment.

**D.   <u>The NBA Allows the Dallas Mavericks to Partner with Voyager as the First International Partnership in NBA History, and Authorized, Encouraged, &Engaged in a Sustained and Aggressive Advertising Campaign to Promote Voyager</u>**

190.    It is clear that the NBA was especially concerned when confronted with the Voyager-Mavericks deal, namely whether the EPAs and Voyager's native token, VGX, were unregistered securities. The NBA nonetheless looked the other way when approving the partnership between Voyager and the Mavericks. This was a particularly important one as it was marketed as the first "International Partnership" in NBA history, though Voyager's principal place of business was located in New Jersey. This was because Voyager would thus be able to circumvent the "traditional" NBA rules for advertising, which required limitations such as confining the promotions to a 150-mile radius of the American Airlines Center, where the Mavericks play.

191.    The NBA's Dallas Mavericks, and its then-70% owner Mark Cuban (who has built his national brand identity around being an extremely savvy and trustworthy investor), were vital members of Voyager's fraudulent scheme to push billions of dollars of its unregistered securities on the American public.

---

[61]      https://andscape.com/features/how-the-nba-social-justice-efforts-dominated-the-season/ (accessed January 31, 2024)

[62]      https://nbpa.com/news/the-nbpa-announces-formation-of-the-national-basketball-social-justice-coalition (accessed January 31, 2024)

192.     Mr. Ehrlich, Voyager's CEO, needed the Mavericks and Mr. Cuban to provide him the necessary gravitas and credibility to do so, particularly in the face of all the state and federal regulatory activities, while the NBA, Cuban, and Mavericks needed Mr. Ehrlich to supplement the hundreds of millions of dollars the team and NBA franchise itself lost as a result of the COVID pandemic and the lack of in-person attendance at Dallas Mavericks games.

193.     Voyager expected to drive activation and investments on the Voyager platform not only by Mavericks fans, but also by millions of NBA fans throughout the world.

194.     The Voyager/Mavericks Global Partnership was the very first "International Partnership" in NBA history. This extraordinary partnership and sponsorship deal could not become effective without the explicit approval of the NBA, as required by the NBA's laws and policies that govern such deals and sponsorships.

195.     The timing of the Voyager/Mavericks Global Partnership was **not coincidental.** The SEC had been cracking down on these exact same, crypto currency interest bearing accounts and crypto tokens, since the very beginning of their existence. The SEC has unequivocally and consistently held that such "Crypto Interest Accounts," as well as the platform's native, branded cryptocurrency tokens, are considered "securities" under the applicable securities laws and thus must be registered and must meet all concomitant regulatory requirements required of registered securities.

196.     As far back as 2017, the SEC began issuing opinions regarding the promotion of similar unregistered offerings for many of the largest crypto platforms, including Coinbase, FTX, Voyager, and BlockFi. After enforcement proceedings were brought by the SEC and state regulators in mid-2021, BlockFi — represented by the law firm Sullivan & Cromwell (who also represented FTX) — agreed to settle similar "unregistered securities" charges with the SEC and numerous state attorneys general, paying an over $100-million-dollar fine and agreeing to injunctive changes regarding their practices surrounding the offer and sale of interest-bearing cryptocurrency accounts. Also in mid-2021, Coinbase was in confidential discussions with the SEC about their similar interest-bearing cryptocurrency accounts. When these discussions were made public, Mark Cuban, who was previously sued by the SEC for alleged insider trading and

believes the SEC is "useless,"[63] decided to gratuitously jump into the dispute, tweeting his position to the SEC, Coinbase, and to his millions of social media followers across the globe.

197.    Specifically, Cuban directed his tweet to Brian Armstrong, Coinbase's CEO and Founder, and stated that Coinbase should **"go on the offensive"** to fight the SEC over its position on Coinbase's proposed Lend Program, which would have been Coinbase's roll out of interest-bearing cryptocurrency accounts.[64] Coinbase, much like BlockFi, lost the fight with the SEC and decided not to roll out the Lend Program.

198.    Ehrlich emailed Cuban:

Hi Mark,Saw [sic] your tweets last night on SEC/Coinbase. I have been in the securities/broker-dealer world for 27 years and would be happy to talk about crypto regulation and how it compares to securities (ie [sic] FINRA/SEC) and where all the gaps are.Its [sic] truly amazing about how the SEC is going about this and could put the US at a competitive disadvantage. Look [sic] forward to discussing all of this and more at some point.

199.    Ehrlich explained the Global Partnership would aid Voyager's goal of bringing "crypto to all":

As a challenger brand, we look to partner with companies and people that want to demystify crypto and challenge the status quo. Partnering with Gronk is a way for us to connect with a broader audience. We know with the Mavs, and with your support, we can help bring crypto to all and truly level the playing field.

200.    Ehrlich also told Cuban that he wanted to "make history and create the first ever NBA Team sponsorship in crypto. I think we can blow the roof off!" And that is precisely what Voyager and the Mavericks did, with the support and approval of the NBA. Unfortunately, the partnership made history for the wrong reasons—it induced widespread investments by class members on the deceptive Voyager Platform, and their investments were lost.

201.    The Dallas Mavericks' first ever, fully integrated, international Voyager/Mavericks Global Partnership (with what was at the time, one of the country's fastest growing cryptocurrency exchanges) was also made during the most dire period in the history of the NBA, when NBA

---

[63]   https://www.yahoo.com/video/mark-cuban-sec-151005564.html   (accessed   May   8, 2023).

[64]                https://decrypt.co/80494/mark-cuban-urges-coinbase-go-offensive-against-sec (accessed May 8, 2023).

Commissioner Adam Silver was quoted as stating that the COVID-19 pandemic could be "the death knell" of the NBA.

202.    According to the Mavericks and Voyager, their five-year exclusive, integrated partnership has a three-fold mission: (a) make cryptocurrency more accessible through educational and digital programs, (b) reach a global audience with activations; and (c) create innovative and transformative fan engagement programs.

203.    In fact, the "primary goals" of the partnership were "helping educate [Mavericks] fans on what the crypto industry was" and "create new customers." *See Karnas*, ECF No. 186, Tapply Tr. 81:4-9; 107-6-9. Given the amount of NBA fans in the country, the NBA and Mavericks knew that their marketing the Voyager Platform would be consumed by the unsuspecting masses. Indeed, Ehrlich conceded that Voyager's "main goal" with the Voyager and Mavericks partnership "was to bring cryptocurrency to the masses," meaning 320 million people.

204.    To induce the Mavericks to enter into the partnership, Voyager offered to overpay by millions of dollars in an unprecedented deal that would bring in significant revenue to the Mavericks over the course of five years, with options to renew, at a time in which the global pandemic had undeniably crippled the NBA and sports industry, and during which stadiums sat largely empty for nearly two years. Notably, at the time the Voyager/Mavericks Global Partnership was signed, the NBA knew that the SEC had already taken actions, specifically against Coinbase and BlockFi, among others, for the exact same type of crypto interest account and crypto tokens.

205.    During their negotiation of the Voyager/Mavericks Global Partnership, the Mavericks and Cuban were concerned that the NBA might withhold their "affirmative approval" because Voyager could not sufficiently answer their very specific and crucial written questions, which are at the very heart in this lawsuit: namely: whether Voyager was offering and selling "unregistered securities" to the American public.

206.    By approving and allowing the Voyager/Mavericks Global Partnership, the NBA helped Voyager achieve its sole goal of driving all U.S. investors to purchase EPAs. Unfortunately for Plaintiffs and the Class, these efforts were wildly successful.

207.    Leading up to the launch of the Global Partnership, the Mavericks and Voyager had strategy discussions about how to "maximize coverage" by the local and national media surrounding the promotion of Voyager by Cuban and the Mavericks. Mavericks' marketing executives discussed that the "media list includes 350 reporters, locally **and nationally**." The

media strategy contemplated providing feeds to national broadcasters like CNBC, without any restrictions on covering the events in Florida and nationwide; in fact, they made sure all those residents were to be reached and targeted.

208.   The national press conference announcing the Voyager/Mavericks Global Partnership was a wild success, picked up by all the news outlets across the country and yielding **billions of online impressions.** Thousands of new Voyager customers purchased EPAs during the first 48 hours after the Voyager/Mavericks world and internet news conference, including over 5,000 Florida residents who all used the same "MAVS100" promotional code that Mark Cuban specifically hyped at the Press Conference. This was clearly the ultimate goal that the Mavericks were tasked by Voyager with achieving: help and encourage investors to open Voyager accounts to trade on the Voyager platform.

209.   This is exactly what the Dallas Mavericks did, and they did on a nationwide basis. This was the ***first international partnership*** of the Dallas Mavericks, which allowed the Mavericks to run **national promotions** (rather than only within 150-mile radius). Again, the Voyager/Mavericks Global Partnership was subject to express approval by the NBA.

210.   Notably, the NBA itself had warned teams that to enter a sponsorship deal with a cryptocurrency company, the team needed to "ensure regulatory compliance" of the crypto product and obtain NBA approval.

211.   It is clear from the emails exchanged between Voyager and the Mavericks that the NBA was **very much concerned** with (the same basic questions in this case), namely whether the EPAs and Voyager's native token, VGX, were unregistered securities, as relayed by the Mavericks' in-house counsel, Mr. Sekou Lewis, to David Brill, general counsel for Voyager, by email on October 16, 2021.

212.   In order to provide a legal opinion on whether VGX was a security, Voyager insisted that the Mavericks execute an NDA, which Ryan Mackey, then Senior Vice President for Corporate Sponsorships, signed on behalf of the Mavericks. The NBA expressed its serious concerns about the legality of this Voyager/Mavericks Global Partnership, due specifically to the existing SEC "cease and desist" action brought against Coinbase, for the same earn reward program.

213.   After several days of back and forth with no clear resolution, on October 25, 2021, Mackey reached out to NBA representatives, letting them know "we're having some trouble

getting our contract done…are either one of you available to talk about this really quick? May need some assistance! Thank you!"

214.    Ehrlich ultimately reached out to Cuban directly two days later, at 8:35am on October 27, 2021, just hours before the press conference announcing the Global Partnership, explaining that, because of Voyager's offerings and despite providing the McCarter & English Legal Opinion to the Mavericks' counsel, the deal was being *"held up by legal,"* and asking Cuban to *"guide us to the finish line."*

215.    Cuban responded at 9:16am "Let me find out more from Sekou [Lewis, the Mavericks General Counsel]." At 10:08am, Mr. Sekou Lewis informed the Mavericks team that "*Mark said* it was ok to go forward with the deal." At 11:04am, Mackey informed Marcia Steinberg, Vice President of Team Marketing & Business Operations for the NBA, *"Well, we're going with it,"* after forwarding her a copy of the press release announcing the partnership, published two minutes prior.

216.    The NBA did not protest, veto, or demand that the press conference be cancelled. Instead, the NBA thereafter approved the Voyager and the Mavericks' first fully integrated international partnership. As a result, in October 2021, Voyager officially became the first international partner of the Mavericks.[65]

217.    On October 29, 2021, the parties executed the Voyager/Mavericks Global Partnership (the "Sponsorship Agreement"). Under the terms of the Agreement, Voyager would pay the Mavericks between $4 million and $5 million per year from 2021 to 2026 with the objective that the Mavericks' promotions would help drive activations and investments on the Voyager platform not only by Mavericks fans, but also by NBA fans, including the Plaintiffs and individuals in Florida.

218.    The Voyager/Mavericks Global Partnership was part of the NBA's overall marketing plan to increase revenue. The NBA encourages teams to negotiate international sponsorship arrangements and shares in the revenue derived from such partnerships. In the 2021-2022 season, the NBA's second largest category of sponsorships came from the crypto industry. NBA teams partnered with, among others, Crypto.com, Webull, Coinbase, FTX and Socios.

---

[65] https://www.mavs.com/mavsvoyager/

219.    The Mavericks and Voyager promoted the Global Partnership in the lead-up to executing the Sponsorship Agreement. On October 27, 2021, Voyager Tweeted about "team[ing] up with the @dallasmavs as their official crypto brokerage & international partner. Catch the official press conference live at 4 PM CT // 5 PM ET, with the Mavs, @Ehrls15, and @mcuban. See you on the paint."[266] Later that same day, Voyager Tweeted again that they "could not be more excited to partner with the Dallas Mavericks to make crypto more accessible for all."[67]



---

[66] https://twitter.com/investvoyager/status/1453416487323152384?s=20

[67] https://twitter.com/investvoyager/status/1453416489143386117?s=20



220.     On October 27, 2021, at a Mavericks press conference in Dallas, Texas, Cuban announced that the Mavericks had entered into a 5-year "exclusive, integrated partnership" with Voyager.[68] Cuban explained in the press release that "[t]his partnership makes Voyager the first international partner of the Mavericks, enabling both parties to reach a wider, global audience to raise brand awareness and drive cryptocurrency adoption around the world."

---

[68] https://www.mavs.com/mavsvoyager/ (accessed May 8, 2023).



221.    The Mavericks and Voyager planned for several Mavericks team members to attend the press conference, sit in the audience, and ask at least one question to Cuban or Ehrlich. The Mavericks and Voyager worked together to surreptitiously prepare the questions and "gave" them to the players in advance. *See Karnas*, ECF No. 186, Tapply Tr. 205:3-18. Nobody disclosed to the public that the team members who showed up to the press conference on October 27, 2021, were, in fact, acting as paid shills receiving $5,000 from Voyager (50% of which was paid in VGX tokens) to ask questions to assist in the promotion of Voyager.



222.    Internal documents also show that, in preparing promotion materials for the launch of the partnership and the Mavericks home game on October 28, 2021, the Mavericks marketing team complied with requests by Voyager to edit certain promotional materials to emphasize that Voyager users should "hold" their assets rather than trade them, and to make a misleading edit to a graphic of the market value of BitCoin (i.e., to cut short the line graph showing the recent market value of BitCoin in order to omit the recent dip in the value and disguise the volatility of cryptocurrency).

223.    Local and national media, the Texas Blockchain Council, and Mavericks players attended the October 27, 2021, press conference. In addition to the in-person press conference, which was held at the Mavs Gaming hub, the press conference was livestreamed on mavs.com and garnered 3,700 viewers. There, the Mavericks and Voyager gifted media in attendance personalized "Mavericks x Voyager" pullovers:



224.    At the October 27 press conference, the Mavericks owner, Cuban, and Ehrlich touted the purported benefits of the Voyager Platform for those with limited funds and experience:

> You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."

> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got

me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the app and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.

225.  Ehrlich agreed with Cuban and, in response to player Dorian Finney-Smith's question about how they can get a Voyager account, he added as follows:

That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.

About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more.[69]



---

[69] *Id.*



226.    At the press conference, Cuban even stated:[70]

> I gotta add, I am a customer and I've been a customer for several months now, I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages.
>
> . . .
>
> And, of course, the Mavs being a leader I think we are going to extend this far deeper than just Mavs fans, I think Voyager is going to be a leader amongst sports fans and crypto fans around the country.

227.    Throughout the October 27, 2021 press conference, Cuban continuously represented that Voyager was an easy-to-use platform that offered the best pricing in the market:

> And so for those of you who already use crypto, I know for me it was really easy, I took some of my MATIC tokens that I own and transferred it over because Voyager paid a higher interest rate or return rate than the application I was using before, Aave. So it was really easy to give you a wallet address, you just go into your metamask or whatever you're using, you just send it to that destination address, it shows up an hour later, you start earning more money, and so right immediately I was earning more when I went over to Voyager, and it's the same with USDC, a stablecoin. And

---

[70] https://www.youtube.com/watch?v=aB9GpBOroIw (accessed May 8, 2023).

the other thing about it is for those of you who use DeFi, the pricing is always higher on DeFi as they try to look through all the decentralized financing platforms to try to get the best—not even the best, but *a* price— and so with Voyager, the pricing has been far, far better, so if you're paying attention and want to get the best price, Voyager is a great platform for it.

228.   At this same press conference, in response to player Maxi Kleber asking if it was too late to get into crypto, Ehrlich, continuously touted the Voyager rewards program, characterizing it as a way to "educate" investors while they "create wealth," and particularly that he wanted to get people as young as possible investing in the Voyager Platform:[71]



You know, we have an extensive rewards program. As you hold a certain amount or level of assets you even get more rewards on the program, so we're trying to engage you and bring you in the platform and teach and educate and create that wealth through our extensive rewards program.

. . .

It's never too late. I think actually it's the right time. Because as I've said, I still think it's the first half of the first quarter on crypto adoption. . . . It's a great time to enter the space, learn more, and I think that's the key. You've got to come in, you've got to learn, educate yourself. We help, we help educate, but you've got to learn more. And I think that's the key.

. . .

---

[71] *Id.*

Financial literacy, we need to teach the youth, that's part of what we want to bring, too, is the education when we build out the education, we're in the middle of building that out, crypto 101 is the first thing that we do to teach people. Teach the youth, go to the community and teach the youth about financial literacy, I think that's important because most young kids don't get the opportunity to learn about financial literacy and they wind up going to college and now they're on their own and don't know how to manage their money and they're out in the real world earning salaries and they don't even know what FICA is . . . but that's what happens, and so we need to teach financial literacy and it's gotta start at the young ages, you know we gotta get out there and it's part of the plan.

229.     During the press conference, the Mavericks shamelessly pushed the EPAs and pressed for investors to invest heavily into USDC and other assets on the Voyager Platform, claiming that investing in the EPAs was "***as close to risk free as you're going to get in the crypto universe***," that it was good for small businesses, and even that it was "a lot easier" than opening a savings account for young children at a bank:[72]

---

[72] *Id.*



One of the reasons we want to do the education program is there's a big opportunity for small businesses. One of the challenges of small businesses is if you have any cash in the bank, you're making .025%. You can convert to put it into a USDC stablecoin on Voyager, and I thought it was 7% but now it's 9%. And so I've taken a lot of my cash and made it available on USDC. I'm not here trying to sell you it's 100% risk free, but it's as close to risk free as you're going to get in the crypto universe. And so just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.

. . .

You don't have to spend a lot of money in order to learn. It's not like the stock market where it's impossible except on a few platforms to spend $10 and get started. You know, my now 12-year-old son got me into Dogecoin when it was less than a penny.

. . .

So there's a lot of ways to inexpensively start to get an understanding. And it's a lot easier than even opening up a savings account. It's a pain in the ass to open up a savings account,

particularly for your kids these days. There's so much paperwork, and whether it's yourself personally, someone you're trying to teach—you're trying to teach your kids about personal finance, believe it or not, this is actually a better way, and so that's one of the unique opportunities and why it's not too late.

. . .

It's also something you can do on your phone. You don't have to have a bank account. So, people who are unbanked, trying to learn about financing, but have a smart phone and can download the app, you can start getting into this and saving your money and that's just a unique opportunity.

230.     In making these recommendations to potential investors —and particularly targeting novice investors, young people, and people who don't even necessarily have savings accounts—the NBA's Mavericks had a duty not to make materially misleading or incomplete representations about Voyager or its EPAs.

231.     Given that the Mavericks were enriching themselves by promoting Voyager, they—at a minimum—had a duty to perform due diligence and not to recklessly (a) endorse a financial product that was profoundly risky as being "as close to risk free as you're going to get in the crypto universe" to an audience of "kids" and "people who are unbanked," and (b) claim that it was a "huge opportunity" to make more money than opening a bank account and that it offered "pricing [that] is actually really good." All those factual statements were false. The NBA, the Mavericks, and Cuban knew or should have known they were false and knew or should have known people would rely on them in their investment decisions.

232.     At a minimum, the Mavericks knew that they were making these statements at the October 27, 2021, press conference without any substantial factual basis. They had no factual basis to say, for example, that pricing on Voyager was "really good" because, in fact, the pricing for cryptocurrency trades on Voyager was almost always more expensive than if the trades had been made on other platforms. Indeed, Voyager's pricing was *not* good; it was artificially inflated.



233.    Further, Ehrlich, contrary to the position he is now taking in the Voyager bankruptcy, claimed that the rewards program is based on "staking" assets that customers own (as opposed to lending them out to institutional investors), and falsely stated that he was prioritizing security *and insurance* on customer's cryptocurrency holdings: [73]

> We're connected to about a dozen different market makers, exchanges around the globe, and so we bring a best price back to consumers for that. . . We run a rewards program, so when you bring your assets over, we're going to reward you with earnings on those assets based upon your balances, based upon tokens you hold and so forth. And so it's a whole rewards program that we've built together and it's really probably state of the art when it comes to crypto with rewards programs, and that's how we like to operate, to give consumers rewards back for using and holding assets on the platform.
>
> . . .
>
> Our rewards are generated through staking, you know it's a lot staking these days, we have 30-something coins that we offer rewards on and a bunch of them are on the staking side, yep.
>
> . . .

---

[73] *Id.*

> I was waiting for that question on security, it's a really important aspect. Security starts with you as an individual. What we recommend to every individual that buys and sells cryptocurrency is to use two-factor authorization when you actually hold your cryptocurrency. Do not use an SMS text message, there are a lot of scammers out there, there are a lot of people who try to SIM-swap you, it almost happened to me a month ago, on a Friday night my phone was trying to be SIM-swapped and I caught it quick enough and called the phone company, but I use two-factor authentication and I think everybody should start there. That means using a Google authenticator, authy, duo, or any of the other products you can use for 2fa. Outside of that, after from you to us is we use multiple custodians. We do not keep all our coins in one place, we keep them across multiple custodians, we've built a really detailed infrastructure for that, to make sure that we're spreading that risk and the insurance we get on all of that across multiple custodians, so it starts with the individual and making sure you have proper security and then it's also us as well.

234.    Moreover, during the press conference, the Mavericks went to great lengths to cast investing in the Voyager Platform as a "fun" opportunity with a low cost of entry:[74]

> Access, first and foremost. The simplicity of access, the fact that you don't have to rush into it and put all your money into it so patience is a big part of it. And then experimentation, right? Be curious. . . Because there's such a low cost of introduction and you know obviously the people who need the most education hopefully are spending the least amount of money, there's a lot of programs and educational programs that we can do that guide people through the process. And that's really the key. . . One of the greatest values of the lower cost crypto isn't so much "hey it could be an investment," it's more the community. . . It's a low cost entry to fun.

235.    As an incentive, the Mavericks even ran a promotion shortly after the press conference where individuals who downloaded the Voyager app to invest during a certain time would receive $100 in Bitcoin.[75]

---

[74]  *Id.*

[75]    https://markets.businessinsider.com/news/currencies/mark-cuban-dallas-mavericks-free-bitcoin-100-voyager-digital-app-2021-10 (accessed May 8, 2023).



236.    On October 28, 2021, to promote the partnership announcement, Voyager was the presenting sponsor of the Mavericks game that night against the San Antonio Spurs. As part of that sponsorship, Voyager received, among other things, Mavs100 promotions, LED Scorer's Table Signage, TV-visible LED signage in all televised games, a halftime presentation, and a Voyager $100k Crypto Shootout.





237.     Donning a Voyager t-shirt and surrounded by Mavericks players and Ehrlich, the Mavericks fan hit a half-court shot and walked away with $100,000 worth of cryptocurrency. The videos of that shot, which the Mavericks posted on the team's social media accounts, were viewed hundreds of thousands of times by individuals across the nation.



**Dallas Mavericks** ✔
@dallasmavs

#MFFL 🏀, Isaiah Stone, just won the LARGEST cash prize ever hit for an on-court promotion on the Dallas Mavericks court ‼️

He went home with $100k worth of cryptocurrency (Bitcoin) courtesy of our newest partner, @investvoyager 💰 💰



11:32 PM · Oct 28, 2021

**343** Retweets    **124** Quote Tweets    **3,073** Likes

s





238.    And, on October 27, 2021, in a press release, Cuban stated that "[w]e believe our partnership with Voyager will allow Mavs **and NBA fans** to learn more about Voyager and how they can earn more from Voyagers' platform than from traditional financial applications."[76]

239.    Ehrlich—emphasizing the "educational" nature of the partnership—said "[t]his partnership gives us the opportunity to educate people all over the world on ways to use crypto in their everyday lives. We want to help people learn alternate ways to grow their wealth to achieve true financial freedom and build intergenerational wealth through crypto. We found a great partner to do this with in the Mavs and their owner, Mark Cuban, who is already deeply involved in the space."[77]

240.    Later, on January 15, 2022, viewers could see a TV-visible LED 360 Voyager advertisement during a home game against the Orlando Magic that was streamed in Texas, Florida, and across the country. Per Nielsen TV Exposure Analytics, the total exposure time for the TV-visible LED Stanchion Arm Voyager signage was 1 hour, 33 minutes, and 42 seconds. That is 1 hour, 33 minutes, and 42 seconds of the Mavericks promoting and giving their stamp of approval of Voyager to viewers in Texas, Florida, and across the country.

---

[76] *Id.*

[77] *Id.*







241.    At other home games, there were also TV-visible virtual signage and statistics showing that Voyager signage at the Mavericks' American Airlines Center has appeared in 376 posts on Mavericks' social media. The signage includes a Scorer's Table LED, a TV-visible Stanchion Arm LED, and others. As of June 13, 2022, the total social media exposure for this signage had been 19 million total impressions and 939k total engagements.[78] The Mavericks also featured Voyager in the Fan Clapper Back—a folded poster that when hit against the palm of the fan's hands creates a loud electric thunder that fills the arena—and placed on about 10,000 seats at each game.



242.    At another home game against the Toronto Raptors on January 19, 2022, the Mavericks hosted a "Crypto Dash," another on-court promotion, and on March 21, 2022, at a home game against the Minnesota Timberwolves, the Mavericks hosted Voyager "Skee-Ball," during which every participant received a "Mavericks x Voyager" t-shirt.





243.    None of these promotional activities could have been possible without the NBA approval and support. As the first NBA team sponsorship in crypto, the partnership between Voyager and the Dallas Mavericks was a significant stamp of approval for this new form of investing platform. The promotions by the Mavericks were directed to Florida and beyond. The Sponsorship Agreement itself contemplated and permitted international promotions. There were nationally televised NBA games that featured the Voyager promotions, as well as national promotions through the media and social media that, on information and belief, the NBA knew and intended would reach people in Florida and nationwide. A promotional campaign targeted at "Mavs fans" includes Mavericks fans who live in Florida; likewise, for "NBA fans."

244.    Notably, after Voyager declared bankruptcy and after investors sued Cuban for his instrumental role in promoting Voyager, Cuban sold the Mavericks for a price in excess of $4 billion dollars.[79]

---

[79] *See* https://theathletic.com/5168499/2023/12/29/mark-cuban-mavericks-sale-adelson-family/ (accessed January 25, 2024).

**E.**   **The NBA Had Financial Incentive to Induce Class Members to Invest in Voyager and Trust the Platform**

245.   The NBA itself, as well as the Mavericks, were financially motivated to solicit investors – not only because Voyager was paying them for performing that service, but also because they had expectations of being long-term brand ambassadors for Voyager under a lucrative sponsorship contract.

246.   If more people signed up for Voyager EPAs and purchased VGX tokens based on their promotional activities, the value of VGX tokens and Voyager's stock would rise along with their fortunes. The NBA was incentivized to effectively promote Voyager so that it would continue receiving payments over a number of years.

**F.**   **The NBA Knew or Should Have Known It Was Soliciting or Assisting Voyager Solicit Investments in Unregistered Securities**

247.   At the time the NBA approved the partnership between the Mavericks and Voyager, it was well-aware of the regulatory issues and risks associated with cryptocurrency promotions.

248.   Years before the NBA and Mavericks engaged in the Voyager promotions, the SEC had issued a report warning about potential compliance issues relating to promotion or sale of cryptocurrency that constituted an investment contract. The NBA and Mavericks also knew, or should have known, that Voyager was using investors tokens to engage in the kind of risky financial activity that securities regulators in New Jersey and elsewhere had already concluded required registration disclosures that Voyager was not making.

249.   Indeed, the NBA itself warned teams that to enter a sponsorship deal with a cryptocurrency company, the team needed to "ensure regulatory compliance" of the crypto product and obtain NBA approval. The NBA disregarded these risks in exchange for millions of dollars at a time when it desperately needed cash to survive the devastating blow it had suffered as a result of the pandemic.

**G.**   **The Promotions Were Directed at Plaintiffs in Florida and Customers Nationwide**

250.   The promotional campaign of the NBA, Mavericks, and Voyager was designed to bring cryptocurrency and investing in the deceptive Voyager Platform to the masses. Thus, the promotions by the NBA and Mavericks were directed to Florida and beyond.

251.   The Sponsorship Agreement itself contemplated and permitted national and international promotions of the Voyager platform. There were also nationally televised NBA

games that featured the Voyager promotions, as well as national promotions through the media and social media that, on information and belief, the NBA and the Mavericks knew and intended would reach people in Florida and nationwide.

252.    The NBA-approved promotions by the Mavericks had an immediate and material influence on investors, including those in in Florida. The Mavericks/Voyager partnership launch announcement received 59 pieces of coverage (including 21 broadcast hits) and generated over 1 billion online impressions and over 1.4 billion in broadcast views.

253.    Within just the first 48 hours after the promotions by the NBA's Mavericks, more than 5,300 Voyager accounts **were created by people specifically in Florida** using a MAVS coupon code that was used to persuade them to sign up,. The state of Florida had among the most redemptions of the code compared to other states, demonstrating the targeted impact of the promotion on people in Florida. Indeed, on November 8, 2021, internal Mavericks and Voyager e-mails discussed how in just in 48 hours, there were over 75,000 Voyager downloads using the MAVS coupon code. Voyager made more sales and profits in the state of Florida, than in most other states.

254.    The EPAs that Voyager sold to Plaintiffs were no different (in any manner) than any of the other EPAs that Voyager offered and sold to all investors throughout the nation during the class period, all of which are currently subject to investigation by federal and state regulatory authorities as being unregistered securities, and which number in "at least tens of thousands" in the state of Florida alone.[80]

---

[80] *See* Excerpts of Transcript of Voyager Digital LLC's corporate representative in *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), at ECF No. 34-1, at 89 (41:20–42:15) ("Q. [I]f Mr. Cassidy was in Texas or if he was in California, would there be any differen[ce] that you would look at in this chart in terms of how he was paid interest every month if both people met the minimum amount that was necessary each month? . . . THE WITNESS: No. His earn would be the same, as far as I know, in those state -- in those states. Q. So there's no distinction for the Voyager Earn Program by state. . . . THE WITNESS: Yes, as far as I'm aware."); *see also id.* (107:10–13) ("Q. There's definitely at least tens of thousands of Voyager Platform members that are residents of the State of Florida? A. Oh. Yes."); *id.* (133:2–134:13) ("Q. Okay. So . . . my next question is, all of these investigations that are being done by the State AGs and the SEC applies to Mark Cassidy's account? . . . THE

## II.   ROLES OF STEPHEN EHRLICH AND MARK CUBAN

255.     Before Voyager filed for Chapter 11 bankruptcy, just like Scott Rothstein did in his infamous Ponzi scheme, Voyager required the constant inflow of investor funds (sometimes life savings) into the Voyager Platform, as cash was scarce. To do this, Stephen Ehrlich, CEO and founder of Voyager, made false and misleading public statements that were broadcast around the country through the internet, and enlisted the help of Mark Cuban to do the same, who also invested his own money into the Voyager Platform for this purpose.

256.     Although it is unclear without discovery to what extent Cuban was invested in the Voyager Platform, to what extent he profited from his involvement in soliciting purchases of EPAs from investors around the country, or whether he was able cash out any investments on the Voyager Platform out before Voyager filed Chapter 11 bankruptcy, it would not be the first time he led investors to ruin while he was able to enrich himself at their expense.

257.     Cuban previously endorsed the cryptocurrency Titan by Iron Finance, a coin he publicly endorsed that was trading at $65 promising over 200% APY which then crashed to $0.000000024 within a few days of his endorsement.[81] Cuban reported via Twitter (@mcuban) that "I got hit like everyone else. Crazy part is I got out, thought they were increasing their TVL enough. Than [sic] Bam." Cuban never publicly disclosed whether he lost money in that transaction.[82] What was clear, though, is that Cuban's public endorsement of Titan caused the price to double in a matter of days: "Many crypto investors follow the lead of crypto-friendly billionaires' comments—and that could have contributed to the surge. At the start of June 13, the

---

WITNESS: I'm not sure. I – I would – I think, yes. . . . Q. What else do you need from us so that you can say, as the corporate rep depo -- deponent who is the most qualified to talk about Mark Cassidy's account, that his account is the same account that these attorney generals and the SEC are saying possibly should be registered securities? . . . THE WITNESS: To the extent I know, they – they would not be different from any of the other accounts.").

[81]     https://www.publish0x.com/at-scottcbusiness/celebrity-crypto-endorsements-gone-wrong-xznzyqd (accessed August 10, 2022).

[82]     https://fortune.com/2021/06/17/crypto-titan-token-crash-mark-cuban/ (accessed August 10, 2022).

day of Cubans' blog post, Titan was trading at $29. Three days later, it hit its peak."[83] Thus, Cuban's public statements clearly carry tremendous weight with the public.

258.     As intended by Cuban, Ehrlich, and the Dallas Mavericks, their promotion worked. Hundreds of investors, including Class Member Anand Bhatt, who resides in Wyoming, joined Voyager. Anand recalls that "the only reason I signed up is because of Mark Cuban offering the free Bitcoin/Dallas Mavericks deal."

259.     Others have similarly pointed to Defendants for their decision to join Voyager:

> I opened my Voyager account . . . after hearing Mark Cuban's partnership and support with Voyager I felt overly confident in the platform and I made 3 more deposits . . . I am an inexperienced investor and crypto person and I got caught up in the hype.
>
>     Class Member, Katie Damore
>
> "[I] saw many statements from Mark Cuban stating that Voyager was "100% Risk Free, and it's as close to risk free as you are going to get in the crypto universe . . . [Mark Cuban's] trust in Voyager [] made me purchase the coin from Voyager . . ."
>
>     Class Member, Nikhila Beesetti
>
> "I was aware that Mark Cuban and others . . . had become investors . . . so I felt comfortable to move the bulk of my holdings to Voyager . . . These gave me comfort."
>
>     Class Member, Marshall Peters

260.     A further reason for the necessity of taking in as many customers as possible to use their funds to perpetuate the Voyager Platform and related Ponzi scheme, Founder and President, Steve Ehrlich, explains the importance of "spread revenue" to his investors at the earnings call for Voyager's Second Quarter for Fiscal Year 2021:

> With the growth of assets under management, we remind investors of our 2 main revenue sources, spread revenue and interest revenue. Estimated spread revenue is derived by the trading velocity of our assets while interest revenue was driven by the gross interest earned on the overall assets under management. Historically, the company has earned between 10 to 12% annualized revenue on assets under management.

---

[83] *Id.*

At this point, I would also like to remind investors of certain drivers of our business. As in agency brokerage business, market volatility can often act as our friend. Voyager executes trades and captures spread revenue in both up and down markets. One example of the powerful agency model happened on Tuesday, February 23rd when Bitcoin decreased from a high of $56,000 to $45,000. That day, Voyager experienced a record day for trading volume, revenue and net deposits. Investors were very active buying the dips across all of the coins Voyager offers.

261.    On May 3, 2021, Ehrlich made a number of misrepresentations to induce people to invest in Voyager, including that he and Voyager are "really trying to create wealth for retail investors," and, citing his 25 years of experience in finance, he is "looking out for best interests of consumers." https://www.youtube.com/watch?v=nKevUsTGN3I (accessed August 10, 2022).

262.    On October 13, 2021, when asked in an interview by Dan Weiskopf, "is it true the customers own the crypto, specifically Bitcoin and Ethereum on your platform, where that's not necessarily the case on other platforms," Ehrlich unequivocally stated that customers "absolutely" own all of their crypto on the platform and can remove it at any time:[84]

> Yes, ***they absolutely own it***. ***They can take it off the platform any time they want*** and bring it into their own personal wallets. You know, a lot of customers want us to hold it for them and everyone who brings crypto into us has a specified wallet address for them. But if you want to take it out to your own personal wallet, say you have a Trezor or a Ledger or you were using some other wallet app – ***yes, you*** ***can take it any time you want***. Now we have limits on withdrawals and that's for customer safety and protection but ***you can take anything off whenever you want, you know, no questions asked.***

He also stated that this ownership of the cryptocurrency assets is "a differentiator" from other wallet apps.

263.    Ehrlich also made a number of misleading representations at an October 23, 2019 interview broadcast on the internet,[85] including:

> We aren't an exchange. We are a broker. We are a regulated agency broker so our job is to do nothing but find the best price and execution for the consumers. So we don't have a horse in the race. We don't have proprietary trading, we

---

[84] https://twitter.com/mrstevensteele/status/1549665655275884545?s=11&t=aeo96ASWA8K8FMO gVdpqOA (accessed August 10, 2022).

[85] https://www.youtube.com/watch?v=NwVA1wiDr5E (accessed August 10, 2022)

don't need to get people to put orders off the bid and the ask, we are trying to find the best execution for the consumer on every single trade. We are a traditional online service provider, but in the crypto space.

264.     Ehrlich even personally took to Reddit to host an "AMA" (Ask-Me-Anything) session on the r/Invest_Voyager subreddit, in order to communicate directly with Voyager customers and potential Voyager customers in order to induce them to invest or to continue investing in the Deceptive Voyager Platform:[86]





---

[86] https://www.reddit.com/r/Invest_Voyager/comments/tbyp2w/ama_hi_reddit_im_steve_ehrlich_voyagers_cofounder/?utm_source=share&utm_medium=ios_app&utm_name=iossmf (accessed August 10, 2022)

265.     During that AMA, Ehrlich played up Cuban's involvement as his advisor:



266.     He also played up Voyager's "transparency":



267.    He even advocated for customers to *ditch their bank accounts* in favor of investing in Voyager:



268.    Ehrlich also falsely represented that he and Voyager sought to "ensure the safety and security of all customer assets at all points in time," that customers could earn rewards with "no lockup on your token," and that Voyager "eat[s the] risk on our end to ensure you get a consistent monthly return on your end":

*How does voyager plan to increase staking revenues to maintain their yield payment.*

Our main strategy is to add more staking coins, where we can bring value to our consumers. Over the past 40 days, we've added 20 new coins–10 of which are staking tokens. As you may know, we work with at least 8 custodians and we're looking to add more. We have multiple execution providers and exchanges and multiple node providers delivering new coins with competitive rewards as fast as we can. The key to this is ensuring everything meets our security standards so that we can ensure the safety and security of all customer assets at all points in time

Apart from that, some of our non-staking rewards are based on market demand. We'll always aim to offer competitive rates on as many tokens as we can. Some key benefits outside of the rewards number alone is the ability to earn with no lockup on your token, and the reward rate staying consistent on a monthly basis. The market demand can shift on a daily basis, but we eat that risk on our end to ensure you get a consistent monthly return on your end.

269.     When specifically asked whether he anticipated any "major fines like BlockFi," Ehrlich sought to reassure his customers:

> *Does voyager anticipate any major fines like BlockFi?*
>
> I believe our rewards program is different from BlockFi's program and complies with current law. I've been in the financial services industry, working with regulators for 28 years now. Since the start of Voyager, we've been in communication with regulators to ensure we operate not only within the rules but we are also planning for any potential necessary changes.

270.     Although Ehrlich claims that one of the major benefits of Voyager is its transparency, his own dealings in connection with Voyager have been extremely opaque. According to a report from CNBC, Ehrlich made millions of dollars selling Voyager shares in February and March 2021 when shares were near their peak, financial records show, in an apparent insider trading move.[87] What is evident, based on corporate insider disclosures and Voyager filings, is that Ehrlich made over $30 million disposing of Voyager equity as the crypto lender's shares neared an all-time high.[88] Ehrlich and his Delaware LLCs sold nearly 1.9 million shares from February 9, 2021, to March 31, 2021, in 11 separate sales which totaled $31 million, according to data from the Canadian Securities Administration.[89] The three largest of Ehrlich's transactions – totaling 1.4 million shares worth nearly $19 million – were connected to a $50,000,000 secondary offering by Stifel Nicolaus in February 2021.[90] Voyager shares would peak at $29.86 ***a week after Ehrlich's final sale*** on April 5, 2021.[91] Three weeks later, VOYG

---

[87]     https://www.cnbc.com/2022/08/03/voyager-ceo-made-millions-in-stock-sales-in-2021.html (accessed
August 10, 2022).

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.*

shares had lost 41% of their value. By November 2021 — as the crypto market overall was peaking—Voyager was down 69% from its peak.[92]

## III.   ROLE OF DEFENDANT MCCARTER & ENGLISH

271.   Voyager's partnerships and success could not have happened without the important and crucial legal role of McCarter & English. Voyager needed a reputable legal team to stand behind their unregistered products and give them a stamp of approval.

272.   Cryptocurrency projects  require legal opinions in order to be listed on certain exchanges and/or conduct operations with additional third parties that are wary of running afoul of the Securities and Exchange Commission and other federal and state regulatory agencies. With the rise in SEC enforcement actions against "gate keepers", a law firm must comply to the fullest extent possible with applicable U.S. securities laws. Law firms typically will not draft legal opinions for clients until they have conducted a very thorough internal research audit of the client's project and examined any and all applicable case law and codified regulations with respect to the project in question.

273.   The crypto-securities lawyer must first become very familiar with the details of the token to be offered. The token's particular aspects, its governance, its use, its expected value will be fitted into existing securities laws. Only once completed, can a legal opinion be formed and explained, detailing why the new crypto token does or does not qualify as a "security." It is axiomatic that the legal opinion is relied upon—not only by the firm's client, but also by third parties transacting with the client--to verify that the token has undergone technical analysis and that any associated documentation and material has also been classified.

274.   McCarter & English claims to be no stranger to cryptocurrency, as it markets itself on having the "practice and industry experience to guide [clients] through the advantages and opportunities afforded by the emerging technology."[93] McCarter & English's experience even includes "[c]onducting an exchange of previously issued utility tokens for security tokens compliant with the US securities laws."[94]

---

[92] *Id.*

[93] https://www.mccarter.com/services/blockchain-smart-contracts-digital-currencies/

[94] Id.

275.    From March 2021 until September 2022, McCarter & English was retained as legal counsel on numerous matters for Voyager Digital and HTC Trading, a Voyager subsidiary organized under the laws of the Cayman Islands. Mr. Theodore Grannatt, a partner at the Boston office, who had very little prior experience working with crypto companies, was the central and main contact, representative, and partner in charge for the Voyager account at McCarter & English.

276.    Throughout the engagement, Mr. Grannatt worked closely alongside Voyager's team of general counsel. McCarter & English's responsibilities included guiding and advising Voyager to assure that their activities were in compliance with legal guidance. In May 2021, in its capacity as counsel, McCarter & English issued a "legal opinion" on whether Voyager's VGX token was considered a "security" under federal law. McCarter & English concluded in that opinion that the Voyager VGX tokens were not securities (the "Legal Opinion").

277.    The Legal Opinion includes many spurious arguments and claims that are not based on any credible authorities or evidence. The memo relies on the "Framework for 'Investment Contract' Analysis of Digital Assets (April 3, 2019), a speech given by then SEC director of Corporate Finance, Bill Hinman, in September 2018, and two no action letters related to "utility tokens" provided by the SEC. However, during the time that Defendant was preparing the opinion, there was a plethora of other SEC enforcement actions,[95] multiple speeches,[96] Congressional testimony,[97] and several official SEC statements[98] and proclamations,[99] all of which directly contradicted the Legal Opinion's false conclusions. Notably, the memo ignores the 2017 Section 21(a) Report of Investigation that looked at the facts and circumstances of "The DAO," which was an infamous initial coin offering that the SEC found constituted an unregistered security.

---

[95] https://www.sec.gov/spotlight/cybersecurity-enforcement-actions (accessed April 16, 2023).

[96] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed April 16, 2023).

[97] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed April 16, 2023).

[98] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed April 16, 2023).

[99] https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed April 16, 2023).

278. The memo also ignores the SEC's complaint against Telegram, filed on October 11, 2019, and a preliminary injunction issued in May 2020 barring the delivery of Telegram's token, Grams, and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully. Further, footnote 1 to the Hinman speech notes that "this speech expresses the author's views and does not necessarily reflect those of the Commission, the Commissioners or other members of the staff." Hinman was a one-time employee of the SEC who left the Commission in December 2020, well before this memo was written. Therefore, the speech reflects the opinion of one person who was no longer an SEC employee, it cannot, and should not, be taken as legal guidance. Finally, the opinion admits that the first two prongs of the *Howey* test are met and does not raise valid arguments to establish the remaining two are not.

279. Despite clear regulatory guidance and emerging trends in the treatment of cryptocurrencies as securities, McCarter & English failed to adequately adapt or update their legal analyses to reflect these developments, thereby failing in their professional duty to provide informed and current legal advice. This omission by McCarter & English, characterized by reliance on outdated interpretations and a disregard for the SEC's evolving stance on cryptocurrencies, represents a significant lapse in the firm's obligation to exercise due diligence and professional competence in a rapidly changing legal and regulatory environment.

280. Any question as to whether this Legal Opinion was simply "really bad" or whether it was in fact fraudulent, and in furtherance of the Voyager RICO Scheme, can be found in the basic factual assumptions that McCarter & English accepted at that time, in order to generate and furnish the Legal Opinion. To be clear, these crucial facts were false, absurd, silly and comical, if not for the billions in dollars in eventual losses.

281. The Legal Opinion was only generated because they were based upon the following two crucial facts:

   i. Voyager would not "establish, promote, facilitate or encourage a secondary market for the acquisition or disposition of the Voyager [VGX] Tokens" ***"for the purposes of speculative investment in the Voyager [VGX] Tokens",*** and that

   ii. Voyager was and would continue "to market and promote the Swap, to prospective Voyager community members and in public and private forums solely on the basis of

New VGX's utility to obtain functionality on the Voyager Platform ***and not as an opportunity to earn a profit due to the potential of value appreciation of New VGX***."

282.     Not only were both of these crucial declarations ***simply false***, but Voyager proudly touted (in extensive materials carefully reviewed and analysed by both the public, and specifically Mr. Grannatt and his internal McCarter & English team), that Voyager was actively trying (and was successful) in getting their VGX tokens traded on secondary markets, like Binance. More importantly, of course McCarter & English knew that Voyager's main reason for existence was that its VGX token was a way for investors to earn profit because of the potential value appreciation. There was no reasonable basis for Mr. Grannatt to have believed such farcical statements at the time he authored the Legal Opinion. The firm's unquestioning acceptance of misleading information from Voyager, without independent verification, highlights a breach of their ethical duty to conduct thorough and objective legal analyses, particularly when their opinions impact investors and the market.

283.     The required factual basis which McCarter & English were required to accept in order to generate the Legal Opinion, include many more facts which were directly refuted in the other materials. The Legal Opinion relied on facts such as: "[i]ntermediaries are strictly prohibited from making any representation, recommendation, or providing any advice with respect to an investment in the   Voyager Tokens.  Intermediaries are explicitly prohibited from making any statements with respect to the expected, actual, hypothetical, or historical price returns, performance, or trading of the Voyager Tokens, that likelihood of returns or the suitability of the Voyager Tokens for any individual."

284.     Yet, on numerous specific, documented occasions, from as early as April 2021 through October 2021, McCarter & English advised and participated in the drafting of the Voyager Influencer Agreements that were used in Voyager's partnerships with influencers and celebrities. In doing so, McCarter & English knew that Voyager was entering into celebrity influencer agreements which contradicted the language of the Legal Opinion.

285.     More importantly, McCarter & English reviewed many "investor questionnaires" which were provided to Voyager and forwarded to McCarter & English, such as the specific, extensive Investor Questionnaire that the NBA gave to the Dallas Mavericks, who admittedly sent it to Voyager, who admittedly sent it to McCarter & English to review. More importantly, numerous other "Investor Questionnaires" were reviewed by McCarter & English, so any

testimony that they did not know that the Legal Opinion was being shared with Voyager investors is simply false. In fact, current Voyager Defendants the Dallas Mavericks, and Defendant Marc Cuban, have both testified that they relied upon McCarter & English's Legal Opinion as a basis to make their hundreds of millions of dollar partnership with Voyager.

286.    McCarter & English issued the opinion and knew that Voyager was using the Legal Opinion to legitimize and bolster their claims that their products were compliant with securities regulations and were not unregistered securities.

287.    In October 2021, McCarter & English provided legal advice to Voyager concerning a due diligence questionnaire from the NBA, where the NBA questioned, "Does Voyager believe that its interest program is not subject to the same SEC scrutiny and if so why?" In assisting Voyager with the NBA's inquiries, McCarter & English knew that the legal opinion it had issued was factually and legally incorrect and that it would be shared with the NBA. McCarter & English's continued support of Voyager's activities, despite evident regulatory non-compliance and misrepresentations, played a crucial role in facilitating the fraudulent scheme, directly contributing to the harm suffered by Plaintiffs and members of the class.

288.    As described above, the fraudulent Voyager scheme was made possible through the active involvement of McCarter & English who played a crucial and pivotal role. Without the legal opinion, Voyager would not have secured the partnerships it needed, including the Global Partnership. McCarter & English, utilizing interstate means of communication, such as the internet, provided Voyager with misleading documents, i.e. the opinion which was used to solicit partnerships in furtherance of the scheme.

289.    It should not be surprising that the Securities and Exchange Commission has charged lawyers who fraudulently authored baseless legal opinion letters for stocks without researching and evaluating the individual stock offerings. *See* https://www.sec.gov/news/press-release/2013-2013-34htm (last accessed Feb. 2, 2024).

290.    Specifically, in charging attorney Brian Reiss with securities law violations arising from his issuing baseless legal opinions, the SEC noted that "Reiss flouted his responsibilities as a gatekeeper in the issuance of stock, and churned out opinion letters to make a quick buck," said Andrew M. Calamari, Director of the SEC's New York Regional Office. "Attorneys who act as gatekeepers in our markets have a solemn responsibility to ensure that they provide accurate information to the marketplace." Sanjay Wadhwa, Senior Associate Director of the SEC's New

York Regional Office, added, "Reiss falsely claimed he had conducted investigations into various stocks and determined them to be exempt from registration under the securities laws. He misrepresented critical facts, and our enforcement action seeks to bring Reiss's opinion mill to an end."

291.    According to the SEC's complaint, Reiss began issuing fraudulent legal opinion letters that included inaccurate statements bearing on whether the restriction should be lifted, and failed to conduct even a token inquiry into the underlying facts. He knew or recklessly disregarded the fact that shareholders seeking his opinion letters intended to sell their stock in the public markets, and that transfer agents would rely on his opinion letters to issue stock certificates without restrictive legends. With Reiss's baseless assurances, the transfer agents issued stock certificates without restrictive legends and enabled the stock to be traded freely. The SEC also seeks permanent injunctions – including an injunction prohibiting Reiss from providing legal services in connection with an unregistered offer or sale of securities.

292.    Similarly, an action was brought against the law firm Polsinelli PC over allegations the law firm did not do its proper due diligence in representing the company. The complaint, filed in the US District Court for the Middle District of Florida, alleged that Polsinelli lawyers failed to catch false representations made by Michael Ackerman, who created the crypto trading algorithm used by the company. The suit also alleged the Polsinelli did not verify the accuracy of Ackerman's reported returns Vyas attempted to voluntarily dismiss the case against the firm in June, to start anew in Missouri to allege an additional instance of negligence that Vyas said was revealed during discovery. Vyas v. Polsinelli PC, M.D. Fla., No. 8:22-cv-00071, 8/4/23.[100]

293.    The SEC has repeatedly warned that lawyers advising cryptocurrency firms may be violating their professional obligations and assisting others to commit securities law violations. In December 2017, then-SEC Chairman Jay Clayton urged lawyers to read the 2017 Section 21(a) Report of Investigation and subsequent enforcement actions.[101] Then, on January 22, 2018,

---

[100] https://www.bloomberglaw.com/public/desktop/document/VyasvPolsinelliPCetalDocketNo822cv00071MDFlaJan072022CourtDocket/1?doc_id=X1Q6ODK11FO2

[101] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11   (accessed January 31, 2024)

Chairman Clayton said there are initial coin offerings (ICOs) "where the lawyers involved appear to be, on the one hand, assisting promoters in structuring offerings of products that have many of the key features of a securities offering, but call it an "ICO," which sounds pretty close to an "IPO" and on the other hand, claiming "the products are not securities, and the promoters proceed without compliance with the securities laws, which deprives investors of the substantive and procedural investor protection requirements of our securities laws."[102] Clayton renewed his admonishment to lawyers in a joint Wall Street Journal op-ed with then-CFTC Chairman Christopher Giancarlo published on January 24, 2018, in which they warned "[m]arket participants, including lawyers" that they "should be aware that [the SEC and the CFTC] are disturbed by many examples of form being elevated over substance, with form-based arguments depriving investors of mandatory protections."[103]

294.    McCarter & English knew that third parties, including but not limited to Mr. Cuban, the Dallas Mavericks, and the numerous "Investor Questionnaires" were relying upon the law firm's involvement and principally, on their misleading Legal Opinion it had issued.

295.    In fact, in several instances, Voyager's in-house counsel directly asked McCarter & English to draft responses to follow up questions about the Legal Opinion's questionable assertions, and McCarter & English lawyers drafted the responses, continuing to hide the falsity of their "counsel," which was necessary for Voyager to instill the trust and confidence in its operations necessary to obtain the massive partnerships that were used to induce investors to pour billions of dollars in assets into the Voyager scheme.

296.    McCarter & English's involvement in drafting documents that contradicted their legal opinion, such as the Voyager Influencer Agreements, demonstrates their complicity in disseminating false and misleading information, exacerbating the deceit presented to the public and investors.

297.    McCarter & English's failure to retract or revise the legal opinion in light of emerging evidence and regulatory shifts reveals a willful negligence and disregard for professional responsibility, significantly impacting the integrity and reliability of their legal advice.

---

[102] https://www.sec.gov/news/speech/speech-clayton-012218 (accessed January 31, 2024)
[103]    https://www.wsj.com/articles/regulators-are-looking-at-cryptocurrency-1516836363 (accessed January 31, 2024)

## CLASS ACTION ALLEGATIONS

298.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

## I.    CLASS DEFINITIONS

299.    Plaintiffs seek to represent the following Nationwide Class, if the Court finds that New Jersey's securities statutes apply to all class members,[104] or in the alternative to represent their respective State Subclasses (collectively, "the Classes") under their respective state laws:

> (1) **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

Alternative Classes:

> (2) **Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

> (3) **New Jersey Subclass:** All persons in the state of New Jersey who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

---

[104] *See, A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 782, 788, (3d Cir. 1999) (finding that N.J.S.A. § 49:3–60 governs sales of unregistered securities to people in other states provided the transaction occurred partially in New Jersey, even if the transaction would have been legal under the laws of the states where investors were being solicited, because New Jersey had an interest in maintaining the integrity of legitimate, in-state sellers and brokers by preventing the state "from being used as a base of operations for crooks marauding outside the state.").

300.     Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

301.     Plaintiffs reserve the right to modify or amend the definition of the proposed Nationwide Class or State Subclasses, or to include additional classes or Subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Nationwide Class in part because all sales of Voyager EPA or VGX Tokens to Plaintiffs and the Class Members (in which Defendants each substantially participated) occurred from Voyager's principal place of business in New Jersey. Although Defendants' actions occurred in a variety of states, and were directed at people in Florida and a variety of states, all of the securities transaction emanated from the State of New Jersey and therefore violated New Jersey law. Plaintiffs seek certification of the State Subclasses in the alternative.[105]

---

[105] Plaintiffs' Counsel further represent clients from the states of Arizona, Colorado, Georgia, Illinois, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Ohio, Puerto Rico, South Carolina, South Dakota, Texas, Utah, Washington, Wisconsin, and Wyoming, who are all necessarily putative Class Members of the Nationwide Class, and whose claims may be asserted by class representatives from other states. *See In re Zantac (Ranitidine) Prod. Liab. Litigaion*, No. 21-10335, 2022 WL 16729170, at *4 (11th Cir. Nov. 7, 2022) (holding that class representatives have standing to "represent unnamed class members whose claims fall under different states' laws"). Plaintiffs may seek leave of Court to assert claims for these Class Members on behalf of each of these states and territories to the extent necessary to seek certification of Subclasses on their behalf, also in the alternative to the Nationwide Class.

## II.      RULE 23 ALLEGATIONS

### A.  Requirements Of Rule 23(A).

#### i.   Numerosity.

302.    The Classes are comprised of thousands, if not millions, of consumers nationwide and throughout the states of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, Louisiana, Massachusetts, or Connecticut to whom Voyager offered and/or sold EPAs or VGX Tokens. Moreover, thousands, if not millions, of consumers nationwide and throughout these states have executed trades on the Voyager Platform within the applicable limitations period. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through Voyager's corporate records. Undersigned Counsel currently represents dozens of Voyager customers who all have collectively sustained millions of dollars in damages proximately caused by the Voyager Platform.

#### ii.   Commonality/Predominance.

303.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

- whether the EPAs or VGX Tokens were unregistered securities;
- whether Defendants' participation and/or assistance in Voyager's offerings and sales of EPAs or VGX Tokens violate the provisions of the Securities Act and Florida and New Jersey.
- the type and measure of damages suffered by Plaintiffs and the Classes.
- whether the Defendants' representations are deceptive, unfair, false and misleading;
- whether the Defendants' representations are objectively likely to mislead reasonable consumers to believe that their trading platform operates as "100% commission free";
- whether Defendants' practices violate the UDAP statutes of Florida and New Jersey;
- whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

- whether Plaintiffs and Class members are entitled to injunctive relief;
- whether Plaintiffs and Class members are entitled to declaratory relief; and
- whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

### iii.  Typicality.

304.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold Voyager's EPAs or VGX Tokens as a result of Defendants' actions and/or participation in the offering and sale of these unregistered securities, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to Defendants that are unique to Plaintiffs.

### iv.  Adequacy of Representation.

305.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### B.  Requirements of Rule 23(b)(3).

306.    The questions of law or fact common to Plaintiffs' and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in assisting Voyager and others in the marketing, offering, and/or selling the EPA or VGX Tokens, which are unregistered securities, and (2) in making identical and uniform misrepresentations and omissions regarding the functionality of the Voyager Platform.

307.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

308.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

309.     A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

- Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the states;

- Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

- There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

- The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

- Individual suits would not be cost effective or economically maintainable as individual actions; and

- The action is manageable as a class action.

### C.  Requirements of Rule 23(b)(2).

310.     Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling of the EPAs and/or VGX, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

311.     Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions regarding the functionality of the Voyager Platform, aiding and abetting Voyager or conspiring with Voyager to conduct its schemes to defraud investors, and/or in receiving secret undisclosed compensation for their promotion of the Voyager Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**D.      Requirements of Rule 23(c)(4).**

312.     As it is clear that one of the predominant issues regarding Defendants' liability is whether the EPA or VGX Tokens Voyager offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

313.     As it is clear that another predominant issue regarding Defendants' liability is whether they have violated federal law and the consumer protection and securities laws of Florida or New Jersey in making identical and uniform misrepresentations and omissions regarding the functionality of the Voyager Platform, and/or in receiving secret undisclosed compensation for their promotion of the Voyager Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

## CHOICE OF LAW

314.     Voyager is a cryptocurrency broker that operated a cryptocurrency investing application for iOS and Android mobile devices which allowed trading across many cryptocurrency exchanges and allowed the holder of the account to earn interest on their crypto.

315.     Voyager promoted and sold EPA or VGX Tokens to vulnerable and unsophisticated consumers throughout the country from its headquarters in Jersey City, New Jersey.

316.     Voyager benefitted from conducting business in New Jersey yet violated relevant New Jersey statutes and regulations to harm consumers both inside and outside state borders. Because the legally pertinent aspects of Voyager's conduct—false promises related to the sale of cryptocurrency and the offer to sell an unregistered security—both occurred within New Jersey, New Jersey has the right to protect its reputation as a place to conduct lawful and legitimate business through the application of New Jersey state law.

317.     The New Jersey Uniform Securities Act was enacted to "'prevent [New Jersey] from being used as a base of operations for crooks marauding outside the state.'"[106] The Third Circuit, relying on long-established precedent, has recognized that "states are permitted to regulate

---

[106] *Caspersen as Tr. For Samuel M.W. Caspersen Dynasty Tr. V. Oring*, 441 F. Supp. 3d 23, 41 (D.N.J. 2020) quoting *Stevens v. Wrigley Pharmaceutical*, 9 N.J. Misc. 385, 386 (N.J. Ch. Div. 1931).

in-state components of interstate transactions so long as the regulation furthers legitimate in-state interests."[107] In *A.S. Goldmen & Co.*, the Third Circuit interpreted N.J.S.A. § 49:3–60 to apply to the sale of unregistered securities to out-of-state consumers, provided that the offer to sell the security occurred in New Jersey, even if the transaction would have been legal under the laws of the states where investors were being solicited.[108]

318.    New Jersey has a resounding interest in protecting its reputation as a place to conduct lawful securities transactions and has the most significant relationship to the conduct at issue. All of the pertinent conduct related to the securities transactions emanated from New Jersey. Further, Voyager developed and disseminated its advertising from New Jersey, and reached agreement with each Defendant to provide spokesperson and promotional services from the state of New Jersey. For these reasons, this Court should apply New Jersey law to these claims.

319.    In the alternative, this Court should apply the law of the state with the next most significant relationship to the conduct at issue – the state from which each plaintiff purchased the security. Individual classes under Plaintiffs' respective state laws are pled herein, only in the alternative to the nationwide New Jersey Class.

---

[107] *A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 782 (3d Cir. 1999).

[108] *Id.*; *see also In re Libor-Based Fin. Instruments Antitrust Litig.,* 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) (collecting cases and stating "[c]ourts have always recognized that states have a legitimate interest in regulating securities transactions that occur, in relevant part, within the state."); *Simms Inv. Co. v. E.F. Hutton & Co. Inc.*, 699 F. Supp. 543, 545 (M.D.N.C. 1988) ("Blue Sky laws protect two distinct public policies. First, the laws protect resident purchasers of securities, without regard to the origin of the security. Second, the laws protect legitimate resident issuers by exposing illegitimate resident issuers to liability, *without regard to the markets* of the issuer.") (emphasis added).

**COUNT ONE**
**Federal R.I.C.O. Conspiracy, 18 U.S.C. § 1962(d)**

**( Plaintiffs individually and on behalf of the Nationwide Class, against Defendant McCarter & English)**

320.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–319 above, as if fully set forth herein. At all relevant times, and as described below Voyager, McCarter & English, Mr. Ehrlich and others conspired to violate 18 U.S.C. § 1962(c).

321.    Voyager and/or Mr. Ehrlich directed and controlled a RICO enterprise through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities, and other aspects of illegal activity, to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

322.    Voyager, McCarter & English, and Mr. Ehrlich, at all materials times, are and have been "person[s]" within the meaning of 18 U.S.C Code § 1962(d).

323.    The RICO enterprise, the activities of which affected interstate and foreign commerce, was comprised of an association-in-fact of entities and individuals that included Voyager, McCarter & English, Mr. Ehrlich, and other unnamed co-conspirators. Their association was structured by contracts and agreements between and among them, including the Voyager/Mavericks Global Partnership.

324.    Voyager, McCarter & English, and Mr. Ehrlich agreed and combined with persons known and unknown to do a criminal or unlawful act, or a lawful act by criminal or unlawful means. Voyager, McCarter & English, and Mr. Ehrlich objectively manifested agreement to the commission of the RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the Enterprise. Voyager, McCarter & English, and Mr. Ehrlich knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. Section 1962(d).

325.    For its part, Defendant McCarter & English facilitated the scheme to defraud and RICO enterprise by agreeing to provide and providing legal services to Voyager, including through advice and counsel to Voyager on the agreements used to perpetuate the scheme. Defendant McCarter & English did so knowingly, or recklessly, or with willful blindness to the nature of the RICO enterprise, but within the scope of Defendant McCarter & English's employment and in furtherance of the firm's business. In exchange for Defendant McCarter & English's counsel in

these matters, Voyager paid McCarter & English significant fees. Defendant McCarter & English had the specific intent to participate in the overall RICO enterprise, which is evidenced by its words and conduct in providing substantial assistance in facilitating the scheme regarding Voyager's Tokens and Platform which ultimately caused the misappropriation of customer funds.

326.    Voyager, McCarter & English, and Mr. Ehrlich agreement to engage in a pattern of racketeering activity can be reasonably inferred from their mutual financial gain resulting from their pattern of racketeering activity.

327.    As a result of one or more acts predicate to the conspiracy and Defendants' conduct or participation in the conduct of the Enterprise's affairs through a pattern of racketeering activity, Plaintiffs have sustained injury.

328.    As a direct and proximate result of Voyager, McCarter & English, and Mr. Ehrlich's conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962 (d), Plaintiffs and members of the class have been injured in their business and property, causing Plaintiffs to suffer monetary damages in an amount not less than $4,200,000,000.00.

329.    Because of Voyager, McCarter & English, and Mr. Ehrlich's violations of 18 U.S.C. § 1962 (d), Defendant McCarter & English is liable to Plaintiffs for three times the damages Plaintiffs and members of the class have sustained, plus the cost of this suit, including reasonable attorney fees and costs.

Wherefore, Plaintiffs demand judgment against Defendant McCarter & English, providing for all of the following: (a) holding McCarter & English jointly and severally liable to Plaintiffs for three times the amount of the damages suffered by Plaintiffs, including, but not limited to, all out-of-pocket losses, consequential damages, and special damages suffered by the Plaintiffs; (b) awarding Plaintiffs their reasonable attorney fees and costs; and, (c) affording Plaintiffs any other legal or equitable relief to which they may be entitled.

**COUNT TWO**
**Violations of the New -Jersey-Uniform-Securities-Law**
**N.J.S.A. §§ 49:3-60 *et seq*.**
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed**
**individually and on behalf of the New Jersey Subclass against Defendants)**

330.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–319 above, as if fully set forth herein.

331.    The New Jersey Uniform Securities Law ("NJUSL") section 49:3-60, *et seq*., provides that it is unlawful for any person to sell or offer to sell a security within the State of New Jersey unless the security is exempt under section 49:3-50, is a federally covered security, or is registered pursuant to Section 49. The Voyager EPAs and/or VGX Tokens are each a security pursuant to section 49:3-49(m) of the NJUSL. The Voyager EPAs and/or VGX Tokens were and are required to be registered with the Bureau pursuant to section 49:3-60.

332.    The Voyager EPAs and/or VGX Tokens offered for sale to Plaintiffs and Class members have not been registered with the Bureau, are not exempt from registration, and are not federally covered. Defendants, having partnered with and/or assisted Voyager in the solicitation of potential investors and having received monies to do so, per N.J.S.A. 49:3-71(d), materially assisted in and actively participated in Voyager's offer and sale of the unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the Class, and accordingly, violated section 49:3-60.

333.    Additionally, because Defendants knew or should have known about Voyager's sale of unregistered EPAs and/or VGX Tokens, and substantially and materially assisted Voyager in the offer and sale of unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the class, Defendants are secondarily liable as aider-abettors and violated section 49:3-60.

**COUNT THREE**
**Violations of the New Jersey Consumer Fraud Act**
**N.J.S.A §§ 56:8-1 *et seq*.**
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed**
**individually and on behalf of the New Jersey Subclass against Defendant NBA)**

334.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–319 above, as if fully set forth herein.

335.    The New Jersey Consumer Fraud Act ("NJCFA") section 56:8-1, *et seq*., prohibits the "use or employment by any person of any unconscionable commercial practice, deception,

fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." § 56:8-2.

336.    Defendant NBA has engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade in the State of New Jersey. NBA approved, amplified, and promoted Cuban's statements regarding the Voyager Platform being "100% Commission-Free," which statements were false and misleading because Voyager in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform. These omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Cuban and the Mavericks, with NBA's promotion and to NBA's financial benefit, have a tendency or capacity to deceive consumers, such as Plaintiffs and Class members, into investing in the Company's falsely touted business and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Those acts and omissions include, among other things as more fully alleged above:

- knowingly and intentionally concealing NBA's specific roles and interests in Voyager;

- knowingly and intentionally using and/or failing to disclose the use of NBA to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in Voyager, in an effort to induce them to purchase Voyager EPAs and/or VGX Tokens;

- Making statements, either knowingly and intentionally, negligently, or with reckless disregard for their veracity, or that they should have known were false, that the Voyager Platform is "100% Commission-Free" although Voyager did in fact did charge Plaintiff and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

337.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. § 56:8-19.

338.     NBA assisted in Voyager's sale and advertisement of merchandise as those terms are defined in section 56:8-1(d) of the NJCFA and generally, as all states use uniform definitions. Voyager EPAs constitute any objects, wares, goods, commodities, services, or anything offered, directly or indirectly to the public for sale and NBA advertised such merchandise when it directly or indirectly publicized, by dissemination, solicitation, or indorsement or circulation to induce directly or indirectly any person to acquire title or interest in said merchandise.

339.     Plaintiffs and Class members are natural persons and/or legal representatives and accordingly, Plaintiffs and Class members are "person(s)" as that term is defined in section 56:8-1(d).

340.     NBA's   unconscionable   commercial   practices,   deceptive   acts,   and misrepresentations caused damages to Plaintiffs in the amount of their lost investments.

341.     Plaintiffs and Class members have a private right of action against NBA, and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. § 56:8-19.

342.     Plaintiffs and Class members have suffered, and will continue to suffer, irreparable harm if NBA continues to engage in such deceptive, unfair, and unreasonable practices.

### COUNT FOUR
**Declaratory Judgment under the New Jersey Declaratory Judgment Act**
**N. J. S. A. §§ 2A:16-51 *et seq.***
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey Subclass against Defendants McCarter & English and Defendant NBA)**

343.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–319 as if fully set forth herein.

344.     This Count is asserted against NBA under Section 2A:16-59 of the New Jersey Revised Statutes.

345.     The Declaratory Judgments Act ("NJDJA") section 2A:16-51 *et seq*., authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity. *Chamber of Com. of U. S. v. State*, 89 N.J. 131, 140 (1982). To maintain such an action, there must be a "justiciable controversy" between adverse parties, and plaintiff must have an interest in the suit.

346.     Plaintiffs and Class members have an obvious and significant interest in this lawsuit.

347.     Plaintiffs and members of the Class purchased EPAs and/or VGX Tokens, based in part on justifiable reliance on NBA's approval and promotion of misrepresentations and omissions regarding the Voyager Platform as further described hereinabove.

348.     If the true facts had been known, including but not limited to that the EPAs and/or VGX Tokens are unregistered securities, the Voyager Platform does not work as represented, and NBA reaped exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and Class members would not have purchased EPAs and/or VGX Tokens in the first place.

349.     Thus, pursuant to NJDJA section 2A:16-51, there is a justiciable controversy over whether the EPAs and/or VGX Tokens were sold illegally, and whether NBA illegally solicited their purchases from Plaintiffs and Class members. § 2A:16-51.

350.     Plaintiffs and Class members seek an order declaring that the EPAs and/or VGX Tokens were securities required to be registered with the SEC and state regulatory authorities, that the Voyager Platform did not work as represented, and NBA was paid exorbitant sums of money to peddle Voyager to the nation.

**COUNT FIVE**
**Civil Conspiracy**
**to Violate and Assist in the Violation of the New Jersey Consumer Fraud Act**
**N.J.S.A §§ 56:8-1 *et seq*.**
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey Subclass)**

351.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–319 above, as if fully set forth herein.

352.     Voyager directed NBA to engage in and worked together with Voyager, Ehrlich, the Mavericks, and Cuban to engage in deceptive conduct, promotions, and marketing tactics designed to target unsophisticated and innocent consumers in order to get them to download the Voyager Mobile application in violation of NJCFA section 56:8-1.

353.     Voyager represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the

Deceptive Voyager Platform. Voyager also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

354.    Moreover, NBA engaged in deceptive marketing tactics by failing to disclose that it and the Mavericks were being compensated by Voyager for promoting the sale of their securities to consumers in Florida and throughout the United States. These deceptive marketing tactics and misrepresentations include statements about how easy it was to use the Voyager mobile application and how Voyager earnings were more reliable than interest bearing accounts at a bank.

355.    Voyager entered into one or more agreements with the Mavericks, with the NBA's express approval, with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

356.    NBA engaged in unlawful acts with Voyager, namely, the promotion of misrepresentations and omissions of material facts made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform, Voyager's FDIC insured status, and their failure to disclose pertinent information related to their compensation.

357.    The conspiracy among NBA, Voyager, Erlich, the Mavericks, and/or Cuban substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such deception and wrongdoing, because of their experience and extensive relationship with Voyager, as described above and as such, knew that the representations and omissions made to Plaintiffs were deceptive. In the alternative, Plaintiffs argue that NBA should have known. Plaintiffs plead that NBA participated in the deceptions and misrepresentations by participating in the creation of Voyager's marketing strategy which contained clear misstatements and omit material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

358.    NBA's conspiracy with Voyager, Erlich, the Mavericks and/or Cuban caused damages to Plaintiffs in the amount of their lost investments.

**COUNT SIX**
**Violations of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201 *et seq.***
**((Plaintiffs individually and for the Nationwide Class, alternatively Plaintiffs Karnas and**
**Webb individually and for the Florida Subclass against Defendant NBA)**

359.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–319 above, as if fully set forth herein.

360.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") section 501.201, *et seq*. The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2).

361.    Plaintiffs and Class members are consumers —i.e., individuals—as defined by section 501.203. NBA is engaged in trade or commerce within the meaning of the FDUTPA, and other state statutes, in that they are engaged in advertising, soliciting, providing, offering, or distributing, whether by sale or otherwise, a good or service, or any property whether tangible or intangible.

362.    FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1).

363.    NBA's unfair and deceptive practices as described herein are objectively likely to mislead and have misled consumers acting reasonably in the circumstances.

364.    NBA has violated the FDUTPA by engaging in practices that are both deceptive and/or unfair as described herein, which offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

365.    Plaintiffs and Class members have been aggrieved by NBA's unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform after witnessing NBA's advertisements and downloading the Voyager App in the amount of their lost investments.

366.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of NBA, as more fully described herein.

367.    Pursuant to sections 501.211(2) and 501.2105, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

368.    NBA still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if NBA continues to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and Class members to obtain both declaratory or injunctive relief to put an end to NBA's unfair and deceptive scheme.

<u>**COUNT SEVEN**</u>
**Violations of the Florida Securities and Investor Protection Act**
**Fla. Stat. §§ 517.07 *et seq.***
**((Plaintiffs individually for the Nationwide Class, alternatively Plaintiffs Karnas and Webb individually and for the Florida Subclass against Defendant NBA)**

369.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–319 above, as if fully set forth herein.

370.    The Florida Securities and Investor Protection Act ("FSIPA"), section 517.07(1) *et seq.*, provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under section 517.051, is sold in a transaction exempt under § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

371.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

372.    The Voyager EPAs and/or VGX Tokens are each a security pursuant to section 517.021(22)(a), as described more fully herein.

373.    The EPAs and/or VGX Tokens sold and offered for sale to Plaintiffs and Class members were not:

- exempt from registration under § 517.051;
- a federal covered security;
- registered with the Office of Financial Regulations (OFR); or
- sold in a transaction exempt under § 517.061.

374.     Voyager sold and offered to sell the unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the Class.

375.     NBA is an agents of Voyager pursuant to § 517.211, tasked with acting on behalf of Voyager within the state of Florida and beyond to broadly solicit potential investors to purchase cryptocurrency on Voyager. Voyager held itself out as possessing sufficient authority to sell securities when, it publicly collaborated or partnered with NBA, the Mavericks and Cuban, for instance, in a way that sanctioned Cuban to discuss selling Voyager investments and related cryptocurrencies. The average and reasonable person looking at these collaborations and brand partnerships would reasonably believe that Voyager held out itself as possessing sufficient authority to sell securities.

376.     More specifically, Voyager acknowledged its agency relationship with NBA, the Mavericks, and Cuban and their roles as agents who would materially participate in the solicitation and sale of cryptocurrency of Voyager within the state of Florida and beyond when Voyager Tweeted, for instance, that it "could not be more excited to partner with the Dallas Mavericks to make crypto more accessible for all."

377.     Voyager, with NBA's material assistance, offered and sold the unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the Class. As a result of this assistance, NBA violated FSIPA section 517.07 *et seq*.

**COUNT EIGHT**
**Gross Negligence**
**(Plaintiffs individually and for the Nationwide Class, alternatively Plaintiffs Karnas and Webb individually and for the Florida Subclass and Plaintiff Sayed individually and for the New Jersey Subclass against McCarter & English)**

378.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-319 above, as if fully set forth herein.

379.     McCarter & English owed a duty of care to the Plaintiffs and members of the class because they knew that their legal opinion would be relied upon by investors and the users of the Voyager Platform. In fact, McCarter & English knew that their opinion was being relied on by individuals and entities other than Voyager and even participated in answering follow up questionnaires from third parties regarding the legal opinion.

380.     McCarter & English breached this duty by providing a legal opinion which falsely classified Voyager's EPAs and VGX Tokens as non-securities, despite clear and substantial

regulatory guidelines and legal precedent to the contrary. This breach was exacerbated by their reliance on obviously false information from Voyager. For instance, they erroneously accepted Voyager's claims that it would not promote or encourage a secondary market for speculative investment in VGX Tokens and that it would market the tokens based on their utility rather than as an investment for profit. These facts, crucial to their legal opinion, were demonstrably false and ignored evidence of Voyager's activities in secondary markets and the investment nature of VGX tokens, which McCarter & English was aware of. By disregarding these critical facts, McCarter & English departed grossly from the conduct expected of a reasonably careful attorney in a similar situation.

381.    In drafting the legal opinion, and failing to retract it, McCarter & English engaged in conduct that was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct including the Plaintiffs and members of the class.

382.    Furthermore, despite the mounting evidence that their legal opinion was based on erroneous facts and was being misused, and the growing body of law indicating that Voyager's EPAs and VGX Tokens were indeed securities, McCarter & English failed to retract and/or amend their opinion. This inaction perpetuated the reliance on their flawed legal advice and was clearly gross negligence.

383.    McCarter & English's breach caused injury to the Plaintiffs and members of the class.

384.    The Plaintiffs and members of the class suffered significant financial damages as a result of the breach.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.    Certifying the Classes as requested herein;

b.    Awarding actual, direct and compensatory damages;

c.    Awarding restitution and disgorgement of revenues if warranted;

d.    Awarding declaratory relief as permitted by law or equity, including declaring Defendants' practices as set forth herein to be unlawful;

e.    Awarding injunctive relief as permitted by law or equity, including enjoining Defendants from continuing those unlawful practices as set forth herein, and

directing Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.      Awarding statutory, punitive, and multiple damages, as appropriate;

g.      Awarding attorneys' fees and costs; and

h.      Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: February 6, 2024

Respectfully submitted,

**By: /s/ Adam M. Moskowitz**

Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
Barbara C. Lewis
barbara@moskowitz-law.com
Florida Bar No. 118114
John E. Rodstrom
john@moskowitz-law.com
Florida Bar No. 1003112
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Telephone: (305) 740-1423

*Co-Counsel for Plaintiffs and the Class*

Kerry J. Miller
(*pro hac vice* forthcoming)
Molly L. Wells
(*pro hac vice* forthcoming)
C. Hogan Paschal
(*pro hac vice* forthcoming)
**FISHMAN HAYGOOD L.L.P.**
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
(504) 586-5252; (504) 586-5250 fax
kmiller@fishmanhaygood.com
mwells@fishmanhaygood.com
hpaschal@fishmanhaygood.com

*Co-Counsel for Plaintiffs and the Class*

Jose Ferrer
Florida Bar No. 173746
Desiree Fernandez
Florida Bar No. 119518
**MARK MIGDAL HAYDEN LLP**
80 SW 8th Street, Suite 1999
Miami, FL 33130
Office: 305-374-0440
jose@markmigdal.com
desiree@markmigdal.com

*Co-Counsel for Plaintiffs and the Class*